No. 58 August 28, 2014 59

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

MARK LAWRENCE UNGER,
*Respondent on Review.*

(CC 09C42443; CA A144192; SC S060888)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 17, 2013.

Rolf Moan, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the briefs were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Jason E. Thompson, Ferder Casebeer French & Thompson, LP, Salem, argued the cause and filed the brief for respondent on review.

BALMER, C. J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

Landau, J., concurred and filed an opinion.

Walters, J., dissented and filed an opinion, in which Baldwin, J., joined.

Brewer, J., dissented and filed an opinion.

Baldwin, J., dissented and filed an opinion, in which Walters, J., joined.

_____

* Appeal from Marion Court Circuit Court, Thomas M. Hart, Judge. 252 Or App 478, 287 P3d 1196 (2012).

**BALMER, C. J.**

In this criminal case, we again consider when evidence discovered following a person's voluntary consent to search must be suppressed on the theory that the police exploited a prior illegality to obtain the consent. Last year, we addressed that issue in *State v. Hemenway*, 353 Or 129, 295 P3d 617 (2013), and modified part of this court's exploitation analysis previously described in *State v. Hall*, 339 Or 7, 34-35, 115 P3d 908 (2005). Shortly after issuing *Hemenway*, this court learned that the defendant in that case had died before the court had issued its opinion. Accordingly, we vacated our decision as moot. *State v. Hemenway*, 353 Or 498, 506, 302 P3d 413 (2013). In this case, as in *Hemenway*, the state asks this court to revisit the exploitation analysis in *Hall* and either overrule it or modify it as the court did in *Hemenway*. Defendant, on the other hand, asks this court to reaffirm *Hall*.

The state charged defendant with manufacture of cocaine and endangering the welfare of a minor, among other things. Before trial, defendant moved to suppress physical evidence and statements obtained by detectives after they knocked on the back door of defendant's house and obtained defendant's consent to enter and then to search the house. Defendant argued both that his consent had not been voluntary and that the detectives had exploited their unlawful conduct to obtain his consent in violation of Article I, section 9, of the Oregon Constitution.[1] The trial court denied the motion, and a jury convicted defendant on four of the counts charged. The Court of Appeals reversed, reasoning that, under the *Hall* exploitation analysis, the detectives' unlawful entry into defendant's backyard to reach his back door had "tainted [defendant's] subsequent consent." *State v. Unger*, 252 Or App 478, 487-88, 287 P3d 1196 (2012). For the reasons that follow, we reverse the decision of the Court

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

of Appeals. In doing so, we modify part of the exploitation analysis announced in *Hall*.

## I.   FACTS AND PROCEEDINGS BELOW

The Marion County Sheriff's Office received a complaint about drug activity at defendant's house, and an informant had reported that young children were staying there and had access to drugs and guns. In response, three detectives from the sheriff's office and one detective from the Canby Police Department went to the house around 10:00 a.m. to conduct a "knock-and-talk." One detective knocked on the front door, but received no response. Another detective then knocked on a basement door on the lower level of the front of the house, but he also received no response. Despite the lack of responses, several cars were in the driveway, and the detectives thought that someone likely was home.

One detective, Roberts, eventually followed a path around the lower level of the house, which led up to a wraparound porch in back, where there was a sliding glass door that was partially covered with drapes. Roberts knocked on the sliding glass door, and, when defendant came to the door, it appeared that defendant had just woken up. Roberts introduced himself as "Kevin [Roberts] with the sheriff's office," and he explained that there had been a complaint about the house. Defendant asked to put on a robe and then gave the detectives permission to enter the house. At some point during the initial interaction between defendant and Roberts, at least two of the other detectives joined Roberts at the sliding glass door.[2]

The sliding glass door opened into a bedroom, and defendant led the detectives through the bedroom, where a woman was in bed, to the kitchen. In the kitchen, the detectives introduced themselves and again explained why they were there. The detectives then asked if defendant would show them around the house, and defendant agreed.

---

[2] In ruling on defendant's motion to suppress, the trial court stated, "I find that [defendant] allowed [the detectives] consensual entry into the house and three out of the four of [the detectives] came through the back door ***." The trial court did not address whether or how the fourth detective had entered the house.

Defendant took the detectives on a tour of the house, and throughout that tour, defendant was "cooperative." When defendant showed the detectives the lower level of the house, Roberts noticed a torn piece of a bag that was coated with a white powder and contained some small crystals. Roberts told Detective Cypert what he had found, and Cypert passed that information along to defendant. Cypert then read defendant a "consent to search" card, which included a warning that defendant did not have to consent, but defendant refused to sign the card without first consulting his attorney. Cypert testified that defendant had given the detectives "verbal consent to continue to look through the house," and defendant called his attorney. Meanwhile, one of the detectives performed a field test on the torn piece of bag.

After defendant spoke to his attorney, he told the detectives that his attorney wanted the detectives to leave the house. According to Cypert, Cypert told defendant that "it was ultimately up to [defendant] to make that decision if he wanted [the detectives] out of the house," and defendant said he wanted to speak to his attorney again. After speaking to his attorney a second time, defendant told the detectives that he wanted everybody out of the house. By that point, however, the bag that Roberts had found had tested positive for methamphetamine, and the detectives placed defendant under arrest. The detectives obtained a search warrant based on the evidence found during their initial interactions with defendant, and they discovered additional incriminating evidence when executing the warrant.

Before trial, defendant moved to suppress all evidence and statements obtained as a result of the detectives' "unlawful entry into the home and subsequent search, seizure, interrogation and arrest." Defendant argued both that his consent had not been voluntary and that the detectives had exploited their unlawful entry into his backyard to obtain his consent in violation of Article I, section 9, of the Oregon Constitution.[3] The trial court denied the motion,

_____

[3] Defendant also cited the Fourth Amendment to the United States Constitution in his motion to suppress, but he does not make any argument under the Fourth Amendment before this court.

finding that defendant had "allowed [the detectives] con-
sensual entry into the house" and that "the consent [had
been] freely and voluntarily made." The trial court did not
expressly address whether the detectives' position in the
backyard at the sliding glass door had been unlawful, and,
if so, whether the detectives had exploited that illegality to
obtain defendant's consent. In a subsequent jury trial, defen-
dant was convicted on four of the counts charged. Defendant
appealed the trial court's denial of his motion to suppress.

        The Court of Appeals reversed and remanded. The
court first determined that the detectives had trespassed in
violation of Article I, section 9, when they entered defendant's
backyard and knocked on his back door. *Unger*, 252 Or App
at 483. Because, on appeal, defendant did not argue that
his consent had been involuntarily given, the court went on
to apply the exploitation analysis set forth in *Hall* to deter-
mine "whether the [detectives'] illegal entry into defendant's
backyard invalidated defendant's consent to the [detectives']
entry into and search of his home."[4] *Id.* at 483-84.

        In *Hall*, this court described a two-step analysis to
determine whether evidence obtained pursuant to volun-
tary consent must nonetheless be suppressed. Under *Hall*, a
defendant must establish a "minimal factual nexus" between
the evidence that the defendant seeks to suppress and the
prior unlawful police conduct. If the defendant makes that
showing, then the state must show that (1) the police inevi-
tably would have obtained the evidence through lawful pro-
cedures; (2) the police obtained the evidence independently
of the illegal conduct; or, as relevant here, (3) the illegal con-
duct was "independent of, or only tenuously related to" the
disputed evidence. *Hall*, 339 Or at 25, 35. In determining
whether the illegal police conduct was "independent of, or
only tenuously related to," the disputed evidence, *Hall* noted
that "[a] causal connection requiring suppression may exist
because the police sought the defendant's consent solely as
the result of knowledge of inculpatory evidence obtained
from unlawful police conduct." *Id.* at 35. The court went on
to state that a causal connection requiring suppression also

_____

[4] The Court of Appeals issued its decision in *Unger* before this court had
issued its decision in *Hemenway* modifying the *Hall* analysis.

may exist if the illegality "significantly affected" the defendant's decision to consent. *Id. Hall* identified several considerations relevant to "determining the existence of such a causal connection":

> "(1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Id.*

In this case, the Court of Appeals determined that defendant had established a minimal factual nexus because "[t]he trespass gave the [detectives] the opportunity to obtain defendant's consent" and "the trespass was ongoing when the [detectives] obtained defendant's consent to enter his house." *Unger*, 252 Or App at 486. The court went on to note that "[t]he state [did] not argue that defendant's consent was independent of or only tenuously related to the [detectives'] trespass" and rejected the state's argument that no exploitation had occurred because the detectives had not sought consent based on anything that they saw during the trespass.[5] *Id.* at 486-87. Thus, the court concluded that the detectives' illegal entry into defendant's backyard had tainted his consent, and the court reversed and remanded.

The state petitioned for review. On review, the state argues that this court should overrule *Hall* by eliminating the exploitation analysis and instead holding that evidence obtained during a voluntary consent search necessarily is admissible despite prior unlawful police conduct. Alternatively, the state argues that this court should adhere to two modifications to *Hall* that were announced in *Hemenway*: According to the state, *Hemenway* clarified that *Hall* had undervalued the constitutional significance

---

[5] On review, the state disputes the Court of Appeals' characterization of its argument before that court. The state notes that it did argue that the consent was insufficiently related to the illegal conduct to justify suppression because it argued that, at most, the illegality gave the detectives the opportunity to request consent. That connection, argued the state, would establish only "but for" causation, which would not demonstrate that the detectives had exploited their illegal conduct to obtain defendant's consent.

of voluntary consent and overvalued the constitutional sig-nificance of the temporal proximity between the police ille-gality and the defendant's consent. *See Hemenway*, 353 Or at 144 ("We agree that the exploitation test announced in *Hall* does not account sufficiently for the importance of a defendant's voluntary consent to search."); *id.* at 150 ("[T]he focus on 'temporal proximity' too easily leads to the conclu-sion that any consent search that occurs when a person is unlawfully stopped is invalid, when the better-framed ques-tion is whether police *exploited* the unlawful stop to obtain the consent." (Emphasis in original.)). In this case, the state argues that Article I, section 9, does not require that the evidence be suppressed because defendant voluntarily had consented to the detectives' entry into and search of his house. Alternatively, the state argues that suppression is not required because there is no indication that any illegal-ity significantly affected defendant's decision to voluntarily consent, particularly because the illegality was of short duration and the detectives' conduct was not aggressive or intimidating.

Defendant responds that this court should retain the exploitation analysis set forth in *Hall* because voluntary consent alone is insufficient to overcome police illegality that preceded a defendant's decision to consent. Moreover, defen-dant asserts that this court in *Hall* tailored the exploita-tion analysis to the rationale that underlies Oregon's exclu-sionary rule: the vindication of an individual's right to be free from unreasonable searches and seizures. According to defendant, accounting for the nature of the detectives' misconduct—brief and not aggressive or intimidating—in the exploitation analysis, as the state proposes, would be inconsistent with that rationale. Here, applying the *Hall* analysis, defendant argues that Article I, section 9, requires that the evidence be suppressed because, although defen-dant's consent was voluntary, the detectives exploited their illegal entry into defendant's backyard to place themselves in a position to contact defendant and request his consent. Defendant also notes that no intervening or other circum-stances mitigated the effect of the unlawful police conduct. Thus, defendant argues, this court should affirm the Court of Appeals.

## II.   THE *HALL* EXPLOITATION ANALYSIS

We begin with a summary of the relevant parts of *Hall*. In that case, the defendant voluntarily consented to a search after being stopped by police, and the police discovered drugs. The defendant moved to suppress, arguing that the stop had been illegal and that that illegality required suppression of the evidence despite his voluntary consent to the search. The trial court denied the motion, but the Court of Appeals reversed and ordered the evidence suppressed. 339 Or at 10-12. The state petitioned for review, arguing, among other things, that the defendant's voluntary consent had severed the causal link between the illegal police conduct and the evidence. Thus, in the state's view, the exclusionary rule did not bar the evidence, because the illegal conduct did not bring the evidence to light. *Id.* at 14. On review, a majority of this court first examined the nature of the police interaction with the defendant, concluding that the officer unlawfully had stopped the defendant in violation of Article I, section 9. *Id.* at 19. As discussed below, the majority then addressed the proper framework for determining whether the evidence gleaned from the consent search nevertheless had to be suppressed because of the illegal stop.

The majority in *Hall* began by outlining the history of the exclusionary rule in Oregon and analyzing this court's past treatment of consent searches. The exclusionary rule is constitutionally mandated and serves to vindicate a defendant's personal right to be free from unreasonable searches and seizures. *Id.* at 24. The federal exclusionary rule, by contrast, is premised on deterring police misconduct. *Id.* at 23. The goal of the exclusionary rule in Oregon is to "restore a defendant to the same position as if 'the government's officers had stayed within the law'" by suppressing evidence obtained in violation of the defendant's rights. *Id.* at 24 (quoting *State v. Davis*, 295 Or 227, 234, 666 P2d 802 (1983)).

The majority noted that illegal police conduct may negate a defendant's consent to search and require suppression of evidence in two ways. First, the consent itself may be "involuntary" if the illegal police conduct overcame the defendant's free will and the consent instead resulted from

"police coercion." *Id.* at 20. Second, evidence gained through a voluntary consent search still may require suppression if the defendant's consent to search "derived from" the prior illegal police conduct. *Id.* at 21. The majority rejected the state's argument that only the voluntariness inquiry was necessary, stating that, even when a defendant voluntarily consents,

> "this court's case law * * * makes clear that Article I, section 9, also requires the consideration of the effect of the unlaw-ful police conduct upon the defendant's decision to consent, even if that conduct did not rise to the level of overcoming the defendant's free will."

*Id.* at 32. In particular, the majority relied on *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993), and *State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981), noting that those cases had borrowed from the exploitation analysis that the United States Supreme Court had announced in *Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963), to analyze whether Article I, section 9, required sup-pression of evidence obtained through voluntary consent searches.[6] Although neither *Rodriguez* nor *Kennedy* required suppression on the facts of those cases, the majority in *Hall* noted that both cases had analyzed the issue as whether the defendant's voluntary consent "derived from" the prior illegal seizures. 339 Or at 30-32. The majority determined that "consent is insufficient to establish the admissibility of evidence from a warrantless search if the state cannot prove that the consent was independent of, or only tenuously related to, any preceding violation of the defendant's rights under Article I, section 9." *Id.* at 27 (citing *Rodriguez*, 317 Or at 41-42).

The majority in *Hall* summarized its conclusions as follows:

> "After a defendant shows a minimal factual nexus between unlawful police conduct and the defendant's consent, then

---

[6] The majority also discussed and disavowed parts of *State v. Quinn*, 290 Or 383, 623 P2d 630 (1981), which had relied extensively on *Wong Sun*. The court's rejection of the result in *Quinn* was based on the difference between the state and federal exclusionary rules and *Quinn*'s questionable application of *Wong Sun*, but *Hall* did not reject *Quinn*'s endorsement of the *Wong Sun* exploitation analysis. *Hall*, 339 Or at 26-30.

the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent. A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent. Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent— that mitigated the effect of the unlawful police conduct."

*Id.* at 34-35.

Justice Durham filed a separate opinion, joined by Justice Gillette, concurring in part and dissenting in part. The dissent agreed that the defendant had been illegally stopped, but disagreed that that prior illegality should result in the suppression of the evidence gained through the consent search. The dissent asserted that the defendant's "voluntary consent to the search demonstrate[d] that the disputed evidence came to light as the result of a reasonable, not unreasonable, search." *Id.* at 39 (Durham, J., concurring in part and dissenting in part). The dissent took issue with the majority's reliance on *Rodriguez*, which the dissent characterized as incorrectly focusing on the police decision to seek consent, "rather than the voluntariness of the defendant's consent." *Id.* at 50. In the dissent's view, the inquiry into the voluntariness of a defendant's consent takes into account any prior illegal conduct by the police. *Id.* at 46. And, a voluntary consent to search fully vindicates the defendant's rights under Article I, section 9, because the

evidence was gained as a result of that consent and not by way of the prior illegality. *Id.* at 51.

## III.   CLARIFICATION AND MODIFICATION OF *HALL*

As it did in *Hemenway*, the state argues that we should overrule our 2005 decision in *Hall* and instead hold that evidence found during a voluntary consent search necessarily is admissible under Article I, section 9, despite any prior police illegality. "[T]he principle of *stare decisis* means that the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent." *State v. Ciancanelli*, 339 Or 282, 290, 121 P3d 613 (2005). The state thus has the burden of demonstrating that we should reconsider and reject the rule announced in *Hall*. Similarly to the state's arguments in *Hemenway*, the state argues, among other things, that *Hall* failed to apply this court's "usual paradigm" for analyzing constitutional provisions; that the decision failed to construe the text or discuss the history of Article I, section 9; and that it departed from earlier case law. We have considered—and we reject—the state's argument that *Hall* suffers from the deficiencies that the state asserts. We also note that, in seeking to overrule *Hall*, the state relies in substantial part on arguments that were, in fact, raised by the *Hall* dissent and considered and rejected by the majority.

Although we reject the state's assertion that *Hall* articulated an impermissible construction of Article I, section 9, we agree that *Hall*'s test for exploitation is flawed in some respects and bears refinement. As it did in *Hemenway*, the state argues that internal contradictions mar both steps of *Hall*'s exploitation test and make the test difficult in application and uncertain in result. The state is correct that, in practice, the *Hall* test has caused some confusion. Parties and the courts have struggled to determine when a defendant has met his or her burden of establishing a "minimal factual nexus" and whether the police exploited their illegal conduct to obtain a defendant's consent to search. We turn to those issues.

We begin with a review of the relevant legal principles. In the context of *Hall* and in this case, the inquiry into whether evidence obtained pursuant to a consent search

must be suppressed involves three overlapping issues: (1) whether the initial stop or search was lawful; (2) whether the defendant's consent to the subsequent search was voluntary; and (3) assuming that the initial stop or search was unlawful and the consent to the subsequent search was voluntary, whether the police exploited the illegality to obtain the disputed evidence.

The first issue is the lawfulness of the police-citizen encounter. If the defendant argues that the initial encounter was an unlawful seizure, then the court must examine the nature of that encounter. *See Hall*, 339 Or at 19 (examining nature of encounter between police officer and the defendant before engaging in exploitation analysis). There is nothing constitutionally suspect under Article I, section 9, about police engaging a citizen in conversation and then requesting that citizen's consent to search. *State v. Ashbaugh*, 349 Or 297, 308-09, 317, 244 P3d 360 (2010). In contrast to "mere conversation," which does not implicate Article I, section 9, an officer "stops" an individual—raising potential constitutional issues—when the officer "intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement." *Id.* at 308, 316; *see also State v. Backstrand*, 354 Or 392, 399-402, 412-13, 313 P3d 1084 (2013) (outlining principles that guide analysis of what constitutes a seizure for purposes of Article I, section 9). Article I, section 9, requires the police, before stopping an individual, to have reasonable suspicion that the individual is involved in criminal activity. In the absence of reasonable suspicion (or some other permissible concern, such as officer safety), the individual has the right to be free from police interference and may terminate an encounter with police at will. *See Ashbaugh*, 349 Or at 308-09.

Alternatively, the initial encounter may take the form of a search. A search occurs when "the government invades a protected privacy interest," *State v. Meredith*, 337 Or 299, 303, 96 P3d 342 (2004), and a protected privacy interest may be tied to a particular space. *See State v. Smith*, 327 Or 366, 373, 963 P2d 642 (1998) ("[T]he privacy interests that are protected by Article I, section 9, commonly are circumscribed by the space in which they exist and, more

particularly, by the barriers to public entry (physical and sensory) that define that private space."). A search is "*per se* unreasonable," in violation of Article I, section 9, in the absence of a warrant or an exception to the warrant requirement. *State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011).

The second issue is whether the consent to search was voluntary. The proper test for voluntariness of consent "is to examine the totality of the facts and circumstances to see whether the consent was given by defendant's free will or was the result of coercion, express or implied." *Kennedy*, 290 Or at 502 (citing *Schneckloth v. Bustamonte*, 412 US 218, 226-27, 93 S Ct 2041, 36 L Ed 2d 854 (1973)). To prove the voluntariness of a consent to search in the context of an illegal stop or an illegal search, the state must prove that the defendant's consent was the product of his or her own free will, rather than the result of coercion. *State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983); *see also State v. Stevens*, 311 Or 119, 136, 806 P2d 92 (1991) (consent to search voluntary when no evidence that "the police intimidated or coerced defendant in any way"); *Kennedy*, 290 Or at 504, 506 (consent to search voluntary in light of "an almost total absence of coercive factors").

The specific focus of *Hall* and of this case is the third part of the inquiry: If the police-citizen encounter was unlawful, but the consent to search was voluntary, the issue becomes whether the police exploited their illegal conduct to obtain the consent to search and, by that means, the evidence in question. In *Wong Sun*, the United States Supreme Court described exploitation as "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 US at 488 (internal quotation marks omitted). Since at least *Kennedy*, this court has referred to and used the exploitation analysis announced in *Wong Sun* in the context of determining whether evidence obtained through voluntary consent searches should be suppressed. *See Kennedy*, 290 Or at 501 ("[E]vidence [gained from a consent search during or after alleged police illegality] is to be suppressed only if it is found that the consent was gained by exploitation of the illegality

or that defendant's free will was tainted by the illegal police conduct." (Citing other state and federal jurisdictions that apply *Wong Sun* to consent searches.)). The United States Supreme Court also has used exploitation analysis in the context of consent searches, even when the consent was "voluntary," in the sense that it was not coerced. *See, e.g., Florida v. Royer*, 460 US 491, 501, 507-08, 103 S Ct 1319, 75 L Ed 2d 229 (1983) (voluntary consent to search tainted by illegal detention by police).

The relationship between the voluntariness of consent and exploitation, of course, is a close one. Often, when the circumstances support the determination that consent was voluntary, they also will support the conclusion that there was no exploitation of any prior police misconduct, and the converse also is true. Yet it is important to emphasize that the tests are not identical and that they address separate concerns. As Professor LaFave notes,

> "While there is a sufficient overlap of the voluntariness and [exploitation] tests that often a proper result may be reached by using either one independently, it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality."

Wayne R. LaFave, 4 *Search and Seizure* § 8.2(d), 101 (5th ed 2012) (emphasis in original; footnote omitted).

We agree. Applying both the test for voluntariness of consent and the test for exploitation is necessary to vindicate a defendant's right to be free from unreasonable search and seizure. When, for example, the police stop an individual without reasonable suspicion, the individual's liberty is restrained in violation of Article I, section 9. Because the person stopped is unable to terminate the interaction with police, he or she is subject to police authority in excess of constitutional bounds and is thereby placed at a disadvantage relative to the constitutional position that he or she would have occupied in the absence of the illegal police interference. Similarly, when the police invade a person's protected privacy interest without a warrant (or an exception to the

warrant requirement), the person is subject to governmental scrutiny in excess of what the constitution permits. Exploitation analysis recognizes that police conduct that constitutes an illegal stop or an illegal search may fall short of coercing a defendant to consent to a subsequent request to search, but nevertheless may require suppression because the police took advantage of information gained from their illegal conduct or some other aspect of that conduct to obtain consent—an advantage that they would not have had had the police stayed within the bounds of the law. *Hall*, 339 Or at 27-28. It is that exploitation of the prior police illegality that must be remedied to vindicate an individual's rights. *See State v. Sargent*, 323 Or 455, 462-63, 918 P2d 819 (1996) (suppression of evidence required only when the evidence is a product of the constitutional violation); *State v. Williamson*, 307 Or 621, 626, 772 P2d 404 (1989) (search not valid when consent is "obtained under the pressure of police action that became available to police only by the prior unauthorized conduct").

With that background, we turn to the exploitation test articulated in *Hall*. As noted, *Hall* announced a two-part test for determining whether evidence acquired from a voluntary consent search must be suppressed because the consent was derived from an illegal seizure. First, the defendant must establish a "minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct." 339 Or at 25. Once the defendant establishes that causal link, the burden shifts to the state to prove that the evidence nevertheless is admissible because "the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." *Id.* at 34-35.

A.  *"Minimal Factual Nexus" Test*

For the reasons that follow, we disavow the "minimal factual nexus" part of the *Hall* test. That test was drawn from a case that arose in a significantly different procedural context from *Hall*, and it did not take into account a relevant statute. Moreover, since this court issued *Hall*, the test has been unevenly applied and, apparently, has proved confusing to lawyers and judges. Instead, we hold that, when a

defendant has established that an illegal stop or an illegal search occurred and challenges the validity of his or her subsequent consent to a search, the state bears the burden of demonstrating that (1) the consent was voluntary; and (2) the voluntary consent was not the product of police exploitation of the illegal stop or search.

*Hall* adopted the "minimal factual nexus" component of its test from *State v. Johnson*, 335 Or 511, 73 P3d 282 (2003). In that case, the defendant sought to suppress evidence that had been seized illegally but then later "reseized" pursuant to a warrant. The state asserted that the warrant was "entirely independent of, and was not obtained by exploitation of, the previous illegality." *Id.* at 519. Ordinarily, a search performed under authority of a warrant is subject to a presumption of regularity, and the party challenging the evidence bears the burden to prove the unlawfulness of the search or seizure. *Id.* at 520-21. Before addressing the state's exploitation argument, the court addressed which party bore the burden with regard to proving exploitation or its absence. Because of the presumption of regularity when the police act under authority of a warrant, the court concluded that the defendant had an initial burden to establish a "factual nexus" between prior illegal police conduct and the evidence gained pursuant to an independently valid warrant. *Id.* Once a defendant demonstrates that nexus, the court in *Johnson* wrote, "the presumption of regularity [of the warrant] is undermined and the burden of proof fairly may be shifted to the government to show that the evidence is not tainted by the misconduct." *Id.* at 521.

This court's reliance in *Hall* on *Johnson* was misplaced. By statute, whenever a defendant challenges evidence seized following a warrantless search, the state bears the burden of proving "by a preponderance of the evidence the validity of the search." ORS 133.693(4); *State v. Tucker*, 330 Or 85, 87, 997 P2d 182 (2000). When the police perform a search and seize evidence without a warrant, as in *Hall* and in this case, there is no presumption of regularity to overcome, because there was no warrant and, thus, there is no need for a threshold showing by the defendant to shift the burden to the state. The state already has the burden to prove that the warrantless search was valid.

Moreover, under the *Hall* test, parties were required to first focus on whether or not a "minimal factual nexus" existed before examining the more central issues of (1) whether the police had acted unlawfully in making the initial stop or search; and (2) whether the later consent to search and subsequently discovered evidence were obtained through exploitation of the unlawful police conduct. However, exploitation analysis already considers the existence of a "minimal factual nexus," because determining whether the police exploited their unlawful conduct to gain the disputed evidence necessarily requires an examination of the causal connection between the police conduct and the defendant's consent. Accordingly, the "minimal factual nexus" test is not analytically significant in determining whether the consent to search was the product of the illegal police conduct, such that evidence obtained pursuant to that search must be suppressed.

Because the "minimal factual nexus" test adopted in *Hall* does not have firm grounding in our case law and is inconsistent with ORS 133.693(4)—and because the application of the test has been unclear in our cases since *Hall* and has proved confusing to litigants and the courts—we disavow that part of the *Hall* analysis.

## B.  *Exploitation Test*

We now turn to the remaining—and more central—part of the *Hall* exploitation test. That test requires the state to prove "that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." 339 Or at 35. *Hall* posited two scenarios that may require suppression:

> "A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent."

*Id.* *Hall* identified several considerations relevant to determining whether the "causal connection" between the unlawful

police conduct and the defendant's decision to consent is sufficiently strong that the police can be said to have "exploited" their unlawful conduct to gain the consent, thus requiring suppression of the evidence obtained:

> "(1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Id.*

The state asserts that the *Hall* test does not afford sufficient weight to a defendant's decision to voluntarily relinquish his or her Article I, section 9, right to be free from unreasonable governmental searches and seizures because, under *Hall*, suppression almost always will be required when consent is granted in close temporal proximity to an illegal stop. In *Hall* itself, the court required suppression, "[g]iven the close temporal proximity between the illegal detention and [the] defendant's consent, and the absence of any intervening circumstances or other circumstances mitigating the effect of that unlawful police conduct." *Id.* at 36. This court's cases following *Hall* have reached similar results. *See, e.g.*, *State v. Ayles*, 348 Or 622, 636-39, 237 P3d 805 (2010) (evidence suppressed under *Hall* when statements were made in response to officer questions in close temporal proximity to police illegality and *Miranda* warnings alone were not sufficient to "ensure that the unlawful police conduct did not affect, or had only a tenuous connection to, [the] defendant's responses"); *State v. Rodgers/Kirkeby*, 347 Or 610, 630, 227 P3d 695 (2010) (evidence suppressed under *Hall* when consent granted in close temporal proximity to illegal stop and state failed to demonstrate intervening or mitigating circumstances).

We agree that the exploitation test announced in *Hall* does not account sufficiently for the importance of a defendant's voluntary consent to search. Our cases demonstrate that, in some situations, a defendant's voluntary consent itself may be sufficient to demonstrate that the unlawful conduct did not affect or had only a tenuous connection

to the evidence produced. *See Rodriguez*, 317 Or at 41-42; *Williamson*, 307 Or at 626 (both rejecting proposition that consent "can never legitimize" a search following illegal police conduct). That legal determination—whether, in the circumstances of a particular case, consent has so attenuated the connection between the prior illegal conduct and the evidence obtained in the consent search—requires a court to consider the illegal conduct that comprised the stop or search, the character of the consent, and the causal relationship between the two. In *Kennedy*, for example, the defendant's consent was not "tainted" by the illegal police conduct when there was an "absence of any coercive circumstances surrounding [the] defendant's consent" and the defendant had volunteered consent without prompting from the officers. 290 Or at 504, 506.

The court in *Hall* asserted that the unprompted grant of consent in *Kennedy* and a similar volunteering of consent in *Rodriguez* were intervening circumstances that indicated that there was, at most, a tenuous causal connection between the consent and the prior illegal police conduct. *See Hall*, 339 Or at 34. *Hall*, however, suggested that, had the police asked for (and obtained) the defendant's consent in *Rodriguez*—rather than the defendant having volunteered to be searched—suppression would have been required. *Id*. By asserting that an *unprompted* consent is an intervening circumstance sufficient to mitigate the causal impact of the prior illegality, while positing that a *requested* consent on the same facts would demonstrate the necessary causal connection, *Hall* could be read as effectively having created a *per se* rule that evidence gained from a requested consent search always must be suppressed if that request occurs in close temporal proximity to the illegal stop and no intervening or mitigating circumstances exist.

We agree with the state that such a *per se* rule is untenable. A consent to search that is unprompted or unilateral is relevant evidence of the voluntariness of the consent; as recognized in *Kennedy* and *Rodriguez*, unprompted or volunteered consent is less likely to be a product of illegal police conduct. However, the fact that an officer requested consent does not demonstrate that the officer *necessarily*

*exploited* the prior illegal conduct to gain consent. *Rodriguez*, for example, involved a voluntary consent following an illegal arrest. The officer did not directly ask the defendant for consent to search, but he did ask the defendant if he had any drugs or guns in his apartment. *Rodriguez*, 317 Or at 41. In response to that question, the defendant said, "No, go ahead and look." *Id.* So, even if the defendant's consent in *Rodriguez* was "volunteered," that consent was, in fact, prompted by the officer's question about drugs and guns. *Rodriguez* concluded, nevertheless, that the officer "did not trade on or otherwise take advantage of the arrest to obtain defendant's consent" in light of the factual circumstances, including the manner in which the defendant had given consent. *Id.*

Properly considered, then, a voluntary consent to search that is prompted by an officer's request can be sufficient to demonstrate that the consent is unrelated or only tenuously related to the prior illegal police conduct. Whether the voluntary consent is sufficient—or whether the police exploited their illegal conduct to obtain consent—will depend on the totality of the circumstances. We reject the state's position that voluntary consent during an unlawful stop or search always breaks the causal chain and makes the evidence admissible, as we likewise reject defendant's argument that such consent, standing alone, will rarely, if ever, break the causal chain. Voluntary consent, while important, is not dispositive and does not relieve courts of undertaking the fact-specific exploitation analysis.

We also conclude that *Hall* erred in focusing exclusively on "temporal proximity" and the presence of mitigating or intervening circumstances in determining whether the police exploited unlawful conduct to obtain consent to search.[7] The court in *Hall* correctly stated that determining

---

[7] The court in *Hall* correctly recognized that evidence obtained following unlawful police conduct also will be admissible if the state can prove that the evidence "inevitably" would have been discovered through lawful procedures or that the police obtained the disputed evidence "independently" of the violation of the defendant's rights. 339 Or at 25. However, those considerations are not part of the more focused inquiry as to whether the causal connection between the unlawful conduct and the defendant's consent requires suppression, and neither in *Hall* nor in this case did the state argue "inevitable discovery" or "independent source" as grounds of admissibility of the disputed evidence.

whether the defendant's voluntary consent derived from unlawful police conduct involved a "fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection." 339 Or at 35. But the only "considerations" that the court mentioned as relevant to that inquiry were the temporal proximity between the illegal police conduct and the voluntary consent; the existence of intervening circumstances; and the presence of circumstances that might mitigate the effect of the police misconduct, such as *Miranda* warnings or the police advising the defendant of his right to refuse consent. *Id.* at 35, 35 n 21. Subsequent cases have understandably focused on the considerations highlighted in *Hall*. Those considerations are appropriate, of course; however, in our view, determining based on the totality of the circumstances whether the police *exploited* the prior unlawful conduct to obtain consent often will involve additional considerations, as this case illustrates.

As discussed, our task is to determine whether police "exploited" or "took advantage of" or "traded on" their unlawful conduct to obtain consent, or—examined from the perspective of the consent—whether the consent was "tainted" because it was "derived from" or was a "product of" the unlawful conduct.[8] In making that determination, it

---

[8] This court and the federal courts have used a variety of verbal formulations in an effort to capture one general concept: that some voluntary and otherwise valid consents to search are nevertheless influenced by prior unlawful police conduct to the extent that evidence obtained from the search should be suppressed under the applicable constitutional standard. *See Hall*, 339 Or at 22 (examining whether evidence must be excluded, despite voluntary consent, because that consent "*derived from*—or, stated differently, was obtained by '*exploitation*' of—the unlawful stop" (emphases added)); *Wong Sun*, 371 US at 488 (explaining that courts must examine whether evidence "has been come at by *exploitation*" of a prior illegality (internal quotation marks omitted; emphasis added)); *Brown v. Illinois*, 422 US 590, 600, 604, 95 S Ct 2254, 45 L Ed 2d 416 (1975) (applying *Wong Sun* to determine whether the defendant's statements were obtained by "exploitation of the illegality of his arrest"); *Rodriguez*, 317 Or at 41 (concluding that INS agent "did not *trade on* or otherwise *take advantage of*" unlawful arrest to obtain the defendant's consent to search (emphasis added)); *Ashbaugh*, 349 Or at 307, 318 (examining whether consent search of the defendant's purse "in some sense *derived* from" prior unlawful police stop and concluding that consent was not "the product of" an unlawful stop (emphasis in original)); *Rodgers/Kirkeby*, 347 Or at 628-30 (explaining that evidence may be excluded where "a defendant's [voluntary] consent was *derived from*, or was the *product of*, the prior police illegality" and concluding that consent given during unlawful extension of traffic stop was the product of that unlawful seizure (emphases added)); *Royer*, 460 US at 501 (noting that prior cases have held that "statements given during a period

seems obvious that, in many cases, the nature of the illegal conduct will be a relevant consideration. Unlawful police conduct can take many forms, from a daytime trespass by following a path around the lower level of the defendant's house from a front door to a back door, as in this case, to an unlawful arrest followed by lengthy interrogation at a police station. If the conduct is intrusive, extended, or severe, it is more likely to influence improperly a defendant's consent to search. In contrast, where the nature and severity of the violation is limited, so too may be the extent to which the defendant's consent is "tainted." And where the taint is limited, the degree of attenuation necessary to purge the taint is correspondingly reduced. *See Ayles*, 348 Or at 654 (Kistler, J., dissenting). Thus, voluntary consent to a search in those circumstances is more likely to be sufficient to demonstrate that the consent was "independent of, or only tenuously related to, the unlawful police conduct." *Hall*, 339 Or at 35.

An overlapping but distinct concern relevant to whether a defendant's consent resulted from exploitation of police misconduct is the "purpose and flagrancy" of the misconduct. The "purpose and flagrancy" inquiry comes from *Brown v. Illinois*, 422 US 590, 603-04, 95 S Ct 2254, 45 L Ed 2d 416 (1975), where the United States Supreme Court described the "purpose and flagrancy of the official misconduct" as relevant to exploitation analysis under the Fourth Amendment. In *Wolfe*, this court explained that the *Brown* exploitation factors, including "purpose and flagrancy," were relevant in determining the effect of police misconduct on the voluntariness of a defendant's consent to search. 295 Or at 572. In *Hall*, however, the court asserted that "purpose and flagrancy" "relates to only the deterrence rationale of the Fourth Amendment exclusionary rule and has no applicability to the exclusionary rule under Article I, section 9." 339 Or at 35 n 21. Although the court in *Hall* reiterated the "rights-based" rationale of Article I, section 9, and contrasted it with the "deterrence" rationale of the Fourth Amendment, *see id.* at 22-25, it did not explain why

---

of illegal detention are inadmissible even though voluntarily given if they are the *product of* the illegal detention and not the result of an independent act of free will" (emphasis added)).

"purpose and flagrancy" is not compatible with the "rights-based" approach. On reflection, we think that it is.[9]

Particularly flagrant conduct—such as excessive use of force in unlawfully arresting a defendant, the unlawful forcible entry into a home by multiple officers wielding automatic weapons, or unlawful and lengthy in-custody interrogation—is more likely to affect the defendant's decision to consent than more restrained behavior. *See Brown*, 422 US at 593-94, 604-05 (where officers broke into the defendant's apartment, searched it, and arrested him at gunpoint without probable cause, the defendant's subsequent statements were tainted by flagrant police misconduct); *State v. Olson*, 287 Or 157, 159-60, 166, 598 P2d 670 (1979) (where officers entered the defendant's home at night without consent and arrested him, the defendant's subsequent statements were tainted by police misconduct).[10] By seeking consent after engaging in such flagrant violation of the defendant's constitutional rights, the police improperly exploit their misconduct, because they have placed the defendant "in a worse position than if the governmental officers had acted within the bounds of the law." *See Hall*, 339 Or at 25. Although every police illegality places an individual in a worse position than if no illegality had occurred, it is a matter of degree. Officers who engage in particularly egregious or intimidating misconduct place the individual in a more disadvantaged position, making it easier and more likely for the officer to exploit that illegality to obtain consent. Excluding the subsequently discovered evidence vindicates the defendant's rights and thus is consistent with the rights-based rationale underlying Article I, section 9.

Similarly, the "purpose" of the police misconduct may be a relevant consideration in the exploitation analysis

[9] Justice Landau's concurring opinion argues that this court took a wrong turn in rejecting deterrence as one rationale for excluding evidence because it was obtained in violation of Article I, section 9, and relying exclusively on a "rights-based" rationale. 356 Or at 94-103 (Landau, J., concurring). We need not address that issue, interesting as it is, because we reach the same result based on this court's existing rights-based approach.

[10] Conversely, the absence of flagrant or egregious police conduct, even in a situation where the defendant's Article I, section 9, rights have been violated, can be relevant considerations in determining whether police exploited their misconduct to obtain consent.

in some circumstances. Our cases have rejected constitutional principles that would involve the court in unstructured analysis of a person's subjective understandings, whether that person is a police officer or a defendant. *See Ashbaugh*, 349 Or at 309-16 (reconsidering and rejecting as component of test for "seizure" under Article I, section 9, whether person had "subjective belief" that they had been seized); *Hall*, 339 Or at 28 n 16 (rejecting notion that "a police officer's state of mind is relevant under Article I, section 9"). Instead, this court has focused on objective circumstances, behavior, and verbal comments. *See Ashbaugh*, 349 Or at 316 (focus is on "objective" circumstances of police conduct and what a reasonable person would believe based on the circumstances). However, in some cases, those objective circumstances may indicate the police purpose in engaging in conduct later determined to be unlawful. So, too, may statements that police make at the time or in a later court proceeding. Whether expressed through conduct or comments, the "purpose" of what is later determined to be unlawful police conduct could well be relevant both to understanding the nature of the misconduct and, ultimately, to deciding whether the police exploited that misconduct to obtain consent to search. Again, while *Hall* dismissed the relevance of police "purpose" in a footnote, in our view, that purpose may be an appropriate consideration in the rights-based analysis under Article I, section 9, at least in some circumstances.

Our point here is that, while *Hall* correctly stated that the exploitation inquiry involved consideration of the "totality of the circumstances," that decision's focus on temporal proximity and intervening and mitigating circumstances was too narrow, because, at least by implication, it excluded other relevant considerations. The nature, extent, and severity of police misconduct—and, relatedly, the purpose and flagrancy of that misconduct—can vary dramatically, and ignoring the very different effects that police conduct may have on an individual's consent to a search is neither reasonable nor constitutionally required.

The dissenting opinions make some thoughtful, although ultimately unpersuasive, arguments concerning our exploitation analysis. Most of those arguments are addressed directly or indirectly elsewhere in this opinion, but

several deserve brief additional responses. Justice Baldwin and Justice Walters suggest that we have modified the *Hall* analysis to remove the presumption that a consent search following unlawful police conduct is "tainted" or is invalid. On the contrary, the first part of this opinion in fact eliminates the requirement in *Hall* that the *defendant* show a "minimal factual nexus" between unlawful police conduct and the defendant's consent before any burden shifts to the state. *See* 356 Or at 74 (discussing *Hall*, 339 Or at 34-35). Instead, we view that requirement, which placed an initial burden on the defendant, as being encompassed in the general exploitation analysis. As to that analysis, we adhere to *Hall* in requiring the state to prove that the consent was independent of, or only tenuously related to, the illegal police conduct. 356 Or at 74-75; *Hall*, 339 Or at 35.

Justice Walters and Justice Brewer raise concerns about considering the degree or severity of different constitutional violations as part of the exploitation test. We acknowledge the difficult weighing that may be involved in some circumstances. Yet those challenges cannot be avoided when, as here, the relevant constitutional text prohibits only "unreasonable" searches and seizures; our cases, including *Hall*, admonish us to make that determination based on the "totality of the circumstances"; and the considerations that we have identified as relevant to that determination cut both ways. In our view, to treat a police trespass onto a defendant's property to reach and knock on a back door no differently in terms of its causal effect on defendant's voluntary consent than if the police had broken down all the doors simultaneously, entered the home with guns drawn, and arrested defendant—simply because both scenarios involve violations of Article I, section 9—is to ignore reality. A *per se* rule—either the rule advocated by the state, that voluntary consent (almost always) trumps prior unlawful police conduct, or its opposite, that unlawful police conduct (almost always) trumps later voluntary consent—fails to account for the myriad variety of circumstances in police-citizen interactions. Moreover, it is not even clear that a *per se* rule would have the benefit of predictability, as the threshold issue of whether police acted unlawfully can, in some circumstances, involve close factual questions and is,

of course, subject to the general "reasonableness" test of Article I, section 9.

Relatedly, Justice Brewer and Justice Baldwin express concern that the principles that we apply here would countenance constitutional violations as long as the police are polite or courteous. We do recognize, in contrast to *Hall*, that the purpose and flagrancy of any prior illegality may be relevant to the determination of whether later voluntary consent was the product of the police misconduct. However, we do not hold that polite police misconduct necessarily means that the subsequent consent is valid. Indeed, in *State v. Musser*, 356 Or 148, ___ P3d___ (2014), also decided today, after reviewing all the facts related to the unlawful police conduct and the defendant's subsequent consent to a search, we concluded that the officer had exploited his unlawful conduct to obtain the consent. We therefore suppressed the evidence in that case, notwithstanding the fact that the police conduct was restrained and courteous.

C.   *Summary*

In an effort to clarify this complicated area of law, we again review the basic principles at issue. As noted, the overarching inquiry is whether the evidence that the state seeks to introduce must be suppressed because that evidence was obtained in violation of the defendant's constitutional rights. In the context of *Hall*, where an illegal stop preceded a consent to search, or in the context of this case, where unlawful entry onto defendant's property preceded the consent to search, that inquiry has two prongs. First, the court must assess whether the consent was voluntary. If the consent to search was not voluntary, then the evidence must be suppressed, because only a voluntary consent to search provides an exception in this context to the warrant requirement of Article I, section 9. *See, e.g., State v. Guggenmos*, 350 Or 243, 261-62, 262 n 8, 253 P3d 1042 (2011) (finding no reason to determine whether exploitation analysis would require suppression of evidence because determination that consent was not voluntary required suppression); *Williamson*, 307 Or at 626-27 (Carson, J., concurring) ("The validity of [the defendant's] consent determines the outcome of this case. If the consent were involuntary

and, thus, invalid, the subsequent search and resulting seizure, arrest, and conviction likewise were invalid.").

Second, even if the consent is voluntary, the court must address whether the police exploited their prior illegal conduct to obtain the evidence. Exploitation may be found if, for example, the police illegally stop a vehicle, allowing them to view contraband that otherwise would not have been visible, and then request the driver's consent to search the vehicle as a result of what they saw. In that example, there may be a direct causal connection between the prior illegal stop and the consent because the request for consent itself (and the evidence gathered) resulted from police knowledge of the presence of that evidence, which they had only because they had observed it during the illegal stop. *See Hall*, 339 Or at 35 ("A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct."). We articulated those principles in *Hall* and other cases, and we adhere to them.

*Hall* also held that evidence may be subject to suppression if the police obtained the consent to search through less direct exploitation of their illegal conduct. *Id.* We adhere to that principle as well. As discussed previously, *Hall* stated that the exploitation analysis required consideration of the totality of the circumstances to determine whether the state had carried its burden of proving that the consent was independent of, or only tenuously related to, the unlawful police conduct. However, the only considerations that that case mentioned in analyzing whether the police had exploited their illegal conduct to obtain consent were the temporal proximity between the illegal police conduct and the consent and the presence of any intervening or mitigating circumstances. *Id.* at 35, 35 n 21. In this opinion, we have identified additional considerations that are relevant to that inquiry, including an assessment of the actual police misconduct. We have explained that the nature, extent, and severity of the constitutional violation are relevant, as are the purpose and flagrancy of the misconduct. Depending on the circumstances of the particular case, other considerations may be relevant to the exploitation inquiry. Professor LaFave, summarizing state and federal cases, writes:

> "In determining whether the consent was, as the Court put it in *Brown,* 'obtained by exploitation of an illegal arrest,' account must be taken of the proximity of the consent to the arrest, whether the seizure brought about police observation of the particular object which they sought consent to search, whether the illegal seizure was 'flagrant police misconduct,' whether the consent was volunteered rather than requested by the detaining officers, whether the arrestee was made fully aware of the fact that he could decline to consent and thus prevent an immediate search of the car or residence, whether there has been a significant intervening event such as presentation of the arrestee to a judicial officer, and whether the police purpose underlying the illegality was to obtain the consent."

LaFave, 4 *Search and Seizure* § 8.2(d) at 109-12 (footnotes omitted).

Article I, section 9, prohibits "unreasonable" searches and seizures, and exploitation analysis is necessarily nuanced. As the preceding discussion demonstrates, the test for whether a consent search conducted following an illegal search or stop comports with Article I, section 9, cannot be reduced to a simple formula.

## IV.   APPLICATION

In applying the principles discussed above to the present case, we begin by clarifying what is *not* at issue—the unlawfulness of the detectives' conduct and the voluntariness of defendant's consent. As to the first issue, the Court of Appeals determined that "the [detectives] trespassed when they entered defendant's backyard and knocked on his back door, and the trespass violated defendant's Article I, section 9, rights." *Unger*, 252 Or App at 483. On review, the state accepts that the detectives were unlawfully in defendant's backyard when they obtained his consent to enter his house. As to the second issue, the trial court determined that defendant's consent was "freely and voluntarily made," and defendant does not challenge that ruling on review. Thus, the only issue on review is whether the detectives exploited the unlawful entry into defendant's backyard to obtain his consent. And that issue, in this case, is a narrow one, because there is no indication that the detectives learned of inculpatory evidence as a result of their unlawful conduct and

therefore sought consent to search. *Compare Hall*, 339 Or at 35. Rather, the unlawful conduct simply put the detectives in a place where they could initiate contact with the occupants of the house. Thus, the question reduces to whether the police exploited the unlawful conduct to obtain defendant's consent to search.

To determine whether the state has met its burden of showing that defendant's consent was not the product of the unlawful police conduct, we consider the totality of the circumstances, including the temporal proximity between that misconduct and the consent, and the existence of any intervening or mitigating circumstances. We also consider the nature, purpose, and flagrancy of the misconduct. Because the analysis is a fact-intensive inquiry, we return to the facts.

In response to a complaint about drug activity at defendant's house, as well as information from an informant about the presence of children and concerns that the drugs and guns were accessible to the children, four detectives went to the house around 10:00 a.m. to conduct a "knock-and-talk." The detectives had been told that the children "had actually gotten their hands on the cocaine" and "that there were so many guns in the residence that the children at some point had to walk over the guns." Detectives knocked at two separate doors at the front of the house and received no response. One detective, Roberts, followed a path around the lower level of the house to a wraparound porch at the back of the house and knocked on a sliding glass door. When defendant came to the door, Roberts introduced himself as "Kevin with the sheriff's office" and advised defendant of the drug complaint. The detectives obtained defendant's voluntary consent to enter the house. At least two of the other detectives joined Roberts at the sliding glass door sometime during the initial interaction.

Defendant led the detectives through what turned out to be a bedroom and into the kitchen where the detectives introduced themselves, and Roberts explained to defendant that when a drug complaint is received and "when kids are involved," the detectives "talk to the homeowner and ask for permission and if [the homeowner] would show [them]

around the house." Defendant was "cooperative" and agreed to show the detectives around the house. It was during that tour of the house that Roberts discovered the sandwich bag with methamphetamine residue that provided the basis for defendant's arrest and the subsequent search warrant.[11]

In framing the exploitation inquiry, we first note that the detectives were on defendant's property without his permission, which constituted trespass. The state concedes that, at least after the detectives left the front door and followed a path to the sliding glass door in back, that trespass was a "search" of defendant's property without probable cause, in violation of Article I, section 9. As we discuss in greater detail below in connection with the purpose and flagrancy of the detectives' conduct, however, that unlawful conduct simply brought the detectives, during daylight hours, to a door of the house, which defendant opened. A conversation ensued, and defendant voluntarily consented to the detectives entering the house. The detectives' conduct did not rise to the level of an unlawful arrest or stop. The detectives did not unlawfully enter defendant's home or ignore any gates or "no trespassing" signs. Within the universe of possible unlawful police activity, the trespass here was limited in "extent, nature, and severity." *Ayles*, 348 Or at 654 (Kistler, J., dissenting) (degree of attenuation required to purge taint of unlawful police conduct varies with "extent, nature, and severity of any illegality"); *see also U.S. v. Perea-Rey*, 680 F3d 1179, 1188 (9th Cir 2012) (for Fourth Amendment purposes, the "constitutionality of *** entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home. Officers conducting a knock and talk *** need not approach only a specific door if there are multiple doors accessible to the public."). Nothing in the record suggests that the interaction between the detectives and defendant, including his voluntary consent to the search, was any

_____

[11] It is not clear from the motion to suppress or from the briefing whether defendant argues that the detectives exploited their unlawful entry into defendant's backyard to obtain (1) defendant's consent to enter the house; (2) defendant's consent to take the detectives on a tour of the house; or (3) both. For purposes of this opinion, we assume that defendant is arguing that both the entry and the search of the house violated his Article I, section 9, rights.

different than it would have been if he had answered the initial knock at his front door.

We also consider in the exploitation analysis the temporal proximity between the misconduct and the defendant's consent. The detectives were trespassing on defendant's property when they obtained his consent to enter his home. Moreover, there is no indication that any significant amount of time elapsed between the detectives' initial entry onto defendant's property and defendant's subsequent consent to show the detectives around the home. Both of defendant's consents occurred during or shortly after the detectives' unlawful conduct. *See Hall*, 339 Or at 36 (noting close temporal proximity between consent and unlawful stop of the defendant). Temporal proximity weighs in defendant's favor.

The state does not identify any intervening or mitigating circumstances, such as providing *Miranda* warnings or admonitions to defendant that he could refuse to consent to a search.[12] As discussed above, however, we emphasize that the focus should remain on whether the *totality* of the circumstances indicates that the detectives *exploited* their unlawful conduct to obtain consent. Temporal proximity and intervening or mitigating circumstances are not the only considerations.

We next consider the "purpose and flagrancy" of the detectives' actions, which involves a closer look at the nature and extent of the unlawful police conduct. We do not inquire into the subjective intent or motivations of the detectives, but rather examine statements made by the detectives and the undisputed facts surrounding the contact with defendant. Here, the detectives were following up on information

---

[12] As noted earlier, the officers told defendant, once in the house, that he could refuse consent to search. They did not, however, tell him that he could refuse to consent to their entry at the time that they entered the house. Such admonitions, although not required, may be helpful when the state seeks to show that it did not exploit any police misconduct to obtain consent. *See Hall*, 339 Or at 35 (describing "police officer informing the defendant of the right to refuse consent" as a circumstance that may mitigate "the effect of the unlawful police conduct"). *See also* LaFave, 4 *Search and Seizure* § 8.2(i) at 152-55 (admonitions or warnings not required, but may be significant in determining validity of consent to search).

about drug activity at defendant's home, including information that there were children in the home who had been exposed to both drugs and a large volume of guns. The detectives permissibly knocked on the front door of defendant's home. Although there was no response, several cars were in the driveway, and the detectives thought that someone likely was home, so they followed a path around the house to another door and knocked on it. Their purpose—both in knocking on the front door and later on the sliding glass door—was to contact the homeowner to ask for permission to search the house, not to search for incriminating evidence near the back door. *See Perea-Rey*, 680 F3d at 1187-88 (under Fourth Amendment, officers are permitted to "approach a home to contact the inhabitants" and "need not approach only a specific door"). Moreover, there is no indication that the purpose of going to the back door was that defendant would be more likely to consent at the back door, rather than the front door.

In contrast, when police observe contraband because they have unlawfully stopped someone or unlawfully entered a home—and *then* ask for consent to search, their "purpose" is more likely to be to seize the contraband that they already have seen as a result of their misconduct. In those circumstances, the police have "taken advantage of" or "exploited" their unlawful conduct to the defendant's detriment, and that tainted "purpose" suggests that the defendant's consent, even if voluntary, also may be tainted. So, too, may be a consent that follows a random stop or seizure that lacks probable cause or reasonable suspicion that a crime has been committed and that is nothing more than a fishing expedition for incriminating evidence. LaFave, 4 *Search and Seizure* § 8.2(d) at 111-12, 112 n 154. This case presents none of those scenarios.

Moreover, the detectives' conduct in walking around defendant's house to knock on his door was not flagrant or egregious. The detectives followed a path around the side of the house to the back door, which defendant could have chosen not to open. The detectives did not have to cross any barriers or use force to reach that door; they did not force or even open the door themselves; and there is no indication that defendant had made any effort to keep that space private.

*Compare U.S. v. Robeles-Ortega*, 348 F3d 679, 680-81, 684 (7th Cir 2003) (concluding that evidence was tainted where consent to search was given after "the officers literally broke down the door, without exigent circumstances and without a warrant, and at least five agents rushed into the apartment with guns"). When defendant opened the door, the detectives introduced themselves, explained why they were there, and asked for consent, just as they would have at the front door. Thus, although the detectives' conduct allowed them to contact defendant, the unlawful conduct in which the detectives engaged was not flagrant. In short, nothing about the limited nature of the unlawful conduct, or the purpose or flagrancy of the conduct, suggests that it caused defendant to consent to the search.

Defendant, for his part, does not argue that anything about the nature of the trespass or his interactions with the detectives significantly affected his consent. Rather, he contends that, if the detectives had not unlawfully entered his backyard, they never would have been able to make contact with him and obtain his consent. In other words, defendant argues, "the illegal trespass placed the [detectives] in a position to request defendant's consent," and, "but for" that illegal conduct, "the [detectives] would not have been in a position to obtain defendant's consent." However, this court in *Hall*—the case on which defendant relies—rejected that formulation of the attenuation analysis. *Hall*, 339 Or at 25 ("[T]his court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained 'but for' unlawful police conduct."). That part of *Hall*, along with other parts that we reaffirm, remains sound. Where a defendant has consented voluntarily to a search following police misconduct, we consistently have held that mere but-for causation is insufficient to justify suppression of the evidence, even in the absence of intervening or mitigating circumstances. Here, the state has met its burden of showing that, under the totality of the circumstances, the detectives in this case did not exploit their unlawful entry into defendant's backyard to obtain his consent to enter the house or to obtain his consent to show the detectives around his house.

## V. CONCLUSION

Encounters between the police and citizens can take many different forms. Although unlawful police conduct undoubtedly has an effect on citizens and on how they interact with police officers in certain circumstances, our cases reject the notion that unlawful police conduct necessarily requires suppression of evidence discovered following such conduct. *See Hall*, 339 Or at 25 ("[T]his court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained 'but for' unlawful police conduct.").

For the reasons stated above, we disavow the minimal factual nexus test described in *Hall*. We adhere to the view expressed in *Hall* that a defendant's voluntary consent to search, following unlawful police conduct, may nevertheless require suppression of evidence obtained during the search, if the police exploited their unlawful conduct to gain that consent. However, we modify the exploitation analysis in *Hall,* which considered only the temporal proximity between the unlawful police conduct and the consent and mitigating or intervening circumstances. Rather, courts must consider the totality of the circumstances, as described above, including the nature of the illegal conduct and its purpose and flagrancy, without unduly emphasizing any single consideration.

We share the dissenters' concerns about stability in our case law and protecting Article I, section 9, rights. This case does not damage either. Although we have clarified and modified in part the analysis set out in *Hall*, the narrow issue on which we focus here, as Justice Brewer correctly notes, is a "vexing cranny" of our search and seizure law. 356 Or at 118 (Brewer, J., dissenting). Professor LaFave reminds us that there is "overlap" in the voluntariness and exploitation tests. LaFave, 4 *Search and Seizure* § 8.2(d) at 101. If unlawful police conduct leads to consent to search, the consent may be "involuntary" and also the "product" of the unlawful conduct. Conversely, the same facts that demonstrate that a particular consent was voluntary also may support a conclusion that the consent was not the result

of exploitation of unlawful conduct—or that the police conduct was not unlawful in the first place. The less common (although not rare) situation presented in this case is that the state no longer argues that the police conduct was lawful *and* defendant no longer argues that his consent was involuntary. That procedural posture means that those critical issues are not before us, and we are instead presented with the narrow and specific exploitation issue that we have considered in detail above.

Moreover, we expect that law enforcement officers will act within constitutional limitations in their interactions with Oregon citizens. Civil litigation, tort claims, and training and education—as well as the exclusionary rule—help protect Article I, section 9, rights. We also expect that trial courts will carefully consider claims of unlawful police conduct, disputes over the voluntariness of consent, and whether consent, even if voluntary, was the product of unlawful police conduct—and will make findings of fact when appropriate. An appropriate record will help the appellate courts in our ongoing effort to develop principled and meaningful applications of the fundamental prohibition on unreasonable searches and seizures in Article I, section 9.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.[13]

**LANDAU, J.,** concurring.

As the majority correctly observes, this court's cases hold that the sole rationale for the exclusion of evidence obtained as a result of police misconduct is the vindication of the defendant's constitutional rights. The purpose of excluding evidence unlawfully obtained, the court has explained, is "to restore a defendant to the same position as

---

[13] In addition to the issue raised before this court, defendant raised four other assignments of error before the Court of Appeals. Although the court rejected two of those assignments of error without discussion, the court declined to reach defendant's other two assignments of error because it was unnecessary given the court's disposition in the case. *See Unger*, 252 Or App at 479 n 2. Because we reverse the Court of Appeals, we remand for the Court of Appeals to consider the remaining two assignments of error.

if the government's officers had stayed within the law." *State v. Hall*, 339 Or 7, 24, 115 P3d 908 (2005). In adopting that rationale, the court has categorically rejected deterrence as an explanation for this state's exclusionary rule. In so doing, the court has painted itself into something of a doctrinal corner.

The problem is that the personal rights rationale for Oregon's exclusionary rule is incomplete. It fails to supply an explanation for the exclusion of evidence that, although obtained as a product of prior police misconduct, was obtained with the defendant's consent. If a defendant has, in fact, voluntarily consented to the search, why should the courts not vindicate that decision? *See Hall*, 339 Or at 40-41 (Durham, J., concurring in part and dissenting in part) (consent to search that is "the product of an authentic voluntary choice and not mere resignation to the authority of the police or to the exigencies of the stop or arrest" is sufficient to justify warrantless search).

To answer that question, this court has invoked the idea of "tainted consent." The police misconduct may be of a particular character that it deprives subsequent consent of its force. But the court has had a devil of a time explaining why that is so and precisely how we can identify such a taint. Moreover, the factors that it has identified for determining the existence of such a taint usually have nothing to do with whether the prior police misconduct *actually* affected a defendant's decision to consent. The idea of a tainted consent, then, is something of a fiction.

In my view, there is a straightforward explanation for why, notwithstanding a defendant's consent, certain unlawfully obtained evidence should be excluded: deterrence of future police misconduct. There are some forms of police misconduct that the courts simply should not countenance. Sometimes, regardless of whether a defendant consented, the court should exclude evidence otherwise unlawfully obtained to prevent police from reaping the benefits of their misconduct.

That is not to say that this court has erred in invoking the vindication of personal rights as the rationale for this state's exclusionary rule. It is to say that the court has

erred in adhering to the notion that it is the *sole* rationale for that rule. Of course, correcting that error would require reevaluating a number of this court's prior cases.

For years, this court explained its exclusionary rule in terms of deterrence, following existing federal court interpretation of the Fourth Amendment. In *State v. Nettles*, 287 Or 131, 136, 597 P2d 1243 (1979), for example, the court explicitly endorsed the federal court view that the exclusionary rule is "a judicially created remedy designed to deter future unlawful police conduct and that the rule [is] not for the purpose of compensating for the unlawful invasion of a person's privacy." *See also State v. Holt*, 291 Or 343, 351, 630 P2d 854 (1981) ("The purpose of exclusion is to deter unlawful police conduct by excluding evidence unlawfully obtained from the person against whom it is to be used."); *State v. Quinn*, 290 Or 383, 397, 623 P2d 630 (1981) (referring to the "protective and prophylactic purposes" of the deterrence-based exclusionary rule).

In 1981, however, the court began to shift its focus away from deterrence as a rationale for the exclusionary rule. Writing for the court in *State v. McMurphy*, 291 Or 782, 785, 635 P2d 372 (1981), Justice Linde commented that "the deterrent effect on future practices against others, though a desired consequence, is not the constitutional basis for respecting the rights of a defendant against whom the state proposes to use evidence already seized. In demanding a trial without such evidence, the defendant invokes rights personal to himself." Justice Linde's comment was *obiter dictum*, but it was to lay the groundwork for a rethinking of the rationale for the state's exclusionary rule in subsequent cases.

Two years later, in *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983), the court went so far as to suggest that, historically, the purpose of Oregon's exclusionary rule was to vindicate the personal rights of the defendant "by denying the state the use of evidence secured in violation of those rules against the persons whose rights were violated, or, in effect, by restoring the parties to their position as if the state's officers had remained within the limits of their authority." The court nevertheless acknowledged some

"diversity of expression" as to the rationale for the exclusionary rule, which included in a number of cases the deterrence of future police misconduct. *Id*.

In *State v. Tanner*, 304 Or 312, 745 P2d 757 (1987), however, a deeply divided court (there were five separate opinions) stated categorically that Oregon's exclusionary rule was not predicated on deterrence of police misconduct. Citing *Davis* and *McMurphy*, the court declared that, "[u]nlike the Fourth Amendment exclusionary rule, which has been predicated in recent years on deterrence of police misconduct * * * the exclusionary rule of [Article I,] section 9 is predicated on the personal right of a criminal defendant to be free from an 'unreasonable search, or seizure.'" *Id*. at 315.

Justice Jones, joined by Justice Peterson, dissented, complaining that "[t]he whole theory that Oregon's exclusionary rule is somehow predicated on a personal right of a defendant simply falls for lack of any foundation." *Id*. at 341. Justice Jones challenged the majority's reliance on *McMurphy*, which he said was "predicated on pure *dictum*," *id*. at 330, as well as *Davis*, which he asserted was based on a misreading of prior case law, *id*. at 331-33.

Justice Gillette concurred, but he expressly disassociated himself "from the 'personal right' vs. 'deterrent' struggle into which this case has developed." *Id*. at 324-25. He commented that, although Justice Jones made "some good points" in questioning the majority's description of the court's own prior cases, in his view, the result in that case would be the same under either rationale, so it was unnecessary for him to weigh in on the debate between the dissent and the majority. *Id*.

In *State ex rel. Juv. Dept. v. Rogers*, 314 Or 114, 117-18, 836 P2d 127 (1992), this court expressly disavowed *Nettles*, explaining that its prior decision had relied too much on federal Fourth Amendment analysis in recognizing deterrence as a rationale for the state's exclusionary rule. Since then, the court fairly consistently has reiterated the position that the sole purpose of, and rationale for, the state's exclusionary rule is the vindication of the personal

right to be free from unreasonable searches and seizures. *See, e.g.*, *State v. Smith*, 327 Or 366, 379, 963 P2d 642 (1998) ("This court *** clearly has rejected that deterrence rationale as foreign to the Oregon search and seizure provision, holding, instead, that the Oregon exclusionary rule exists to vindicate a personal right to be free from unlawful searches and seizures."); *State v. Sargent*, 323 Or 455, 462 n 4, 918 P2d 819 (1996) ("Oregon does not follow the rationale that suppression is granted to deter unlawful police conduct.").

It is perhaps worth noting that this court, in staking out the position that deterrence has no role in determining whether evidence must be excluded, stands almost alone. Nearly all the state courts that have adopted an exclusionary rule under their state constitutions recognize that deterrence is, at the very least, a relevant consideration in determining whether to exclude evidence.[1] The Supreme Court of Alaska, for example, has explained that its state constitutional exclusionary rule "has twin rationales. One of these rationales is deterrence of unconstitutional methods of law enforcement. The other rationale is the imperative of judicial integrity." *State v. Sears*, 553 P2d 907, 911-12 (Alaska 1976). The Hawaii Supreme Court, for another example, recognizes that its state exclusionary rule serves three purposes: "(1) judicial integrity, (2) the protection of individual privacy, and (3) deterrence of illegal police misconduct." *State v. McKnight*, 131 Hawai'i 379, 398, 319 P3d 298 (2013). The Idaho Supreme Court likewise has developed its state constitutional exclusionary rule "as a constitutionally mandated remedy for illegal searches and seizures *** [and] a deterrent for police misconduct." *State v. Koivu*, 152 Idaho 511, 519, 272 P3d 483 (2012).[2]

---

[1] I am aware of only two states—New Mexico and Pennsylvania—that have rejected deterrence as a justification for a state exclusionary rule. *See State v. Gutierrez*, 116 NM 431, 446, 863 P2d 1052 (1993) (objective of the exclusionary rule is not to deter police misconduct but "to effectuate in the pending case the constitutional right of the accused to be free from unreasonable search and seizure"); *Com. v. Valentin*, 2000 PA Super 63, 748 A2d 711, 713, *appeal denied*, 564 Pa 731, 766 A2d 1247 (2000) ("While the sole purpose of the exclusionary rule under the Fourth Amendment is to deter police misconduct, Article I, section 8, [of the Pennsylvania Constitution] is meant to embody a strong, abiding, and distinctive notion of privacy.").

[2] *See also State v. Bolt*, 142 Ariz 260, 266 n 7, 689 P2d 519 (1984) ("There are other reasons justifying the existence of the exclusionary rule. When officers

In that light, it strikes me as odd that this court, in recognizing the importance of vindicating personal rights as a justification for this state's exclusionary rule, has concluded that it is necessary to abandon the justification of deterrence. In fact, although the court expended a great deal of effort attempting to justify the personal rights justification in *Davis*, it has never expended much of any effort at explaining why deterrence did not continue to be a valid justification for exclusion as well. The court appears to have predicated its decision on the assumption that it was

purposefully violate the constitution to obtain evidence to use at trial, 'the success of the lawless venture depends entirely on the court's lending its aid by allowing' the use of the evidence. If the law does not permit the gathering of the evidence, the court should not 'have a hand in such dirty business' by allowing its use. Further, it would be a 'pernicious doctrine' to declare that the government should 'commit crimes' in order to secure the conviction of criminals."); *Watson v. State*, 302 Ga App 619, 624, 691 SE2d 378 (2010) ("The rationale behind the exclusionary rule is to prevent the State from capitalizing on police misconduct to put the prosecution in a better position than it would have been if no illegality had occurred."); *People v. McGee*, 268 IllApp3d 32, 43, 644 NE2d 439 (1994) ("In vindicating individual rights, the exclusionary rule encourages compliance by the legislative and executive branches and induces scrutiny and guidance from the judicial branch ***. It encourages the legislature to enact constitutional laws and prevents legislative 'grace' periods during which large classes of constitutional violations may freely take place. It encourages the executive branch to uphold its oath to support the Illinois Constitution while carrying out the duties of the particular office. It permits courts to honor the Constitution other than merely to note its breach."); *State v. Coleman*, 466 So 2d 68, 72 (LaApp2 Cir 1985), *writ denied,* 467 So2d 542 (La 1985) ("The primary purpose of the exclusionary rule *** is to deter *official* misconduct by government agencies in the administration of the criminal law. *** Another recognized purpose of the exclusionary rule is that judicial integrity will be best served by denying the State the use of evidence unconstitutionally obtained or seized from a citizen or from his home." (Emphasis in original.)); *Com. v. Brown*, 456 Mass 708, 715, 925 NE2d 845 (2010) ("One of the purposes *** is the deterrence of police [mis]conduct ***. Another is the protection of judicial integrity through the dissociation of the courts from unlawful conduct."); *State v. Panarello*, 157 NH 204, 207, 949 A2d 732 (2008) ("The purpose of the exclusionary rule is three-fold. *** It serves to: (1) deter police misconduct; (2) redress the injury to the privacy of the victim of the unlawful police conduct; and (3) safeguard compliance with State constitutional protections."); *State v. Harris*, 211 NJ 566, 590, 50 A3d 15 (2012) ("The purpose of the rule is two-fold: 1) to assure that the law does not provide an incentive for police misconduct and 2) to protect judicial integrity."); *Miles v. State*, 1987 OK CR 179, 742 P2d 1150, 1152 (1987) ("The purpose of the exclusionary rule is to deter police misconduct and to provide an effective remedy for unreasonable searches and seizures."); *State v. Patton*, 898 SW2d 732, 734 (Tenn Crim App 1994) ("The dual purposes of the exclusionary rule are to protect fundamental individual liberties and to deter improper police conduct."); *State v. Felix*, 339 Wis2d 670, 695, 811 NW2d 775 ("The purposes of the exclusionary rule are to deter police misconduct and ensure judicial integrity by refusing to rely on evidence obtained through police misconduct ***, but the primary purpose is deterrence.").

required to choose one justification or the other. The case law that I have just noted casts some doubt on the validity of that assumption, however. In my view, there seems to be no good reason why deterrence cannot also inform our evaluation of whether evidence must be excluded.

In the course of the last 30 years of case law, this court has offered some hints as to the source of its discomfort with deterrence. I find none of them particularly persuasive, though. First, in *McMurphy*, Justice Linde suggested in *dictum* that, although deterrence may be "a desired consequence," nevertheless it "is not the constitutional basis for respecting the rights of a defendant against whom the state proposes to use evidence already seized." *McMurphy*, 291 Or at 785. Justice Linde, however, never explained precisely why deterrence lacks a constitutional basis. And, indeed, although this court frequently has repeated the conclusion, to my knowledge, the court has never explained it. The court appears to assume that deterrence is merely a judicially created prophylactic that cannot be rooted in the constitution itself. Even assuming that to be the case, however, I find it useful to note that the court has felt no such hesitation in requiring *Miranda*-type warnings under Article I, section 12, of the Oregon Constitution, even though nothing in the constitution itself requires it. *State v. Moore/Coen*, 349 Or 371, 382, 245 P3d 101 (2010) ("Under, Article I, section 12, the police must give a defendant who is in custody *Miranda*-like warnings prior to questioning."). Indeed, the court has candidly explained that requiring such warnings is not, strictly speaking, required by the text of the constitution; rather, the requirement is a judicially created prophylactic that "may be adapted or replaced from time to time by decisions of this court or by legislation in the light of experience or changing circumstances." *State v. Mains*, 295 Or 640, 645, 669 P2d 1112 (1983).

Second, it has been suggested that adopting a deterrence rationale would open the door for defendants to challenge the admissibility of evidence that was admitted in violation of someone else's constitutional rights. That concern, in fact, appears to be the principal underpinning of the court's rejection of deterrence in *Tanner*. 304 Or at 315-16 ("the search or seizure must violate the defendant's

[Article I,] section 9 rights before evidence obtained thereby will be suppressed; a defendant's section 9 rights are not violated merely by admitting evidence obtained in violation of section 9"). Justice Linde likewise voiced the same concern in *McMurphy*, in which he noted that "it should make no difference whose rights were invaded" if deterrence is the justification for exclusion. 291 Or at 785. But it strikes me that that is valid only if it assumed that deterrence is the sole justification for the state's exclusionary rule.

Third, it also has been suggested that adopting a deterrence rationale for the state's exclusionary rule leads to the recognition of a malleable "good faith exception" that would apply when police officers may violate a defendant's Article I, section 9, rights, but do so in good faith. *See, e.g.*, *Tanner*, 304 Or at 325 (Gillette, J., concurring) ("The vacillation and retraction in recent years in the United States Supreme Court's Fourth Amendment jurisprudence, leading to its inexplicable 'good faith' exception to the exclusionary rule * * * satisfies me that the 'deterrence' rationale does not vindicate adequately the interests to which Article I, section 9, speaks."). But a good faith exception does not necessarily follow from consideration of deterrence as a justification for an exclusionary rule. In any event, the purpose and flagrancy of an officer's conduct already is routinely taken into account, and that strikes me as pretty much the same thing as inquiring into the officer's good faith.

As I noted at the outset, one problem with the court's exclusive focus on personal rights as the basis for its exclusionary rule arises when a defendant consents to a warrantless search or seizure that is in some way causally connected to prior police misconduct. In my view, the personal rights explanation for exclusion fails to explain why a defendant's voluntary consent does not suffice to justify the search.

The court's usual explanation is that the prior illegality can "taint" the otherwise perfectly voluntary consent. But the test for the existence of such a taint has nothing to do with whether the police misconduct actually affected the consent in any way. In *Hall*, for example, a majority of this court declared that, even in a case in which the defendant voluntarily consents to a search, prior police misconduct

will require the exclusion of evidence obtained from that search if that misconduct "significantly affected" the defendant's consent. 339 Or at 34-35. But the three factors that the court listed as an aid to determining whether the misconduct "significantly affected" the defendant's consent— temporal proximity, intervening circumstances, and other circumstances that mitigate the misconduct—need not have anything whatsoever to do with whether the misconduct actually affected the defendant's consent at all, much less substantially so.

Part of the problem, I think, is that the court has borrowed its analysis for excluding otherwise voluntary confessions from Fourth Amendment cases such as *Brown v. Illinois*, 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975), and *Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963). *See, e.g., Hall*, 339 Or at 21 (relying on *Wong Su*n); *State v. Painter*, 296 Or 422, 425, 676 P2d 309 (1984) (relying on *Brown* and *Wong Sun*); *State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983) (relying on *Brown*). The federal "fruit of the poisonous tree" cases, however, have been predicated expressly on the importance of deterrence as a justification for disregarding an otherwise voluntary consent. *Brown*, for example, went to some lengths to emphasize that its exclusion of evidence in cases such as *Wong Sun* was intended to effectuate "the broad deterrent purpose" of the exclusionary rule. 422 US at 599-600.

Indeed, the factors that *Brown* mentioned, and that this court has borrowed—temporal proximity, the presence of intervening circumstances, and the purpose and flagrancy of police misconduct—make much better sense in the context of a policy of deterrence. Each goes to the character of the police actions, regardless of their actual effect on a defendant's decision to consent to a search. Small wonder, then, that this court has struggled to explain its decisions when it is attempting to apply the federal analysis while, at the same, rejecting the rationale for it.

If this court wishes to better explain the exclusion of evidence procured from consent searches based on prior police misconduct, it seems to me that it will have to reconsider its categorical abjuration of deterrence as a

justification for its exclusionary rule and include deterrence as an additional justification for the rule. I suggest that, in an appropriate case, the court should do that. Until then, I join the majority, which gives greater attention to the role of a defendant's consent to a warrantless search.

**WALTERS, J.,** dissenting.

This case begins with a conceded violation of the Oregon Constitution and ends without legal consequence. That is wrong, and, respectfully, I dissent.

Until today, like courts throughout this nation,[1] this court recognized that, when a police officer violates the constitution and then, while the constitutional violation is ongoing, obtains a defendant's voluntary consent to search, the constitutional violation has a causal connection to the consent and the resulting evidence must be suppressed unless the state proves other intervening or mitigating facts. *State v. Ayles*, 348 Or 622, 636, 237 P3d 805 (2010); *State v. Rodgers/Kirkeby*, 347 Or 610, 628-29, 227 P3d 695 (2010); *State v. Hall*, 339 Or 7, 27, 115 P3d 908 (2005); *State v. Olson*, 287 Or 157, 166, 598 P2d 670 (1979). From today, when a police officer violates the Oregon Constitution, a court no longer must presume that the officer gains an advantage, and the state no longer has the burden to prove that the evidence that the officer obtains by pressing that advantage should be admitted.

I concede that the majority does not acknowledge those fundamental shifts. *State v. Unger*, 356 Or 59, ___

---

[1] *See, e.g.*, *United States v. Macias*, 658 F3d 509, 524 (5th Cir 2011) (suppressing evidence from voluntary consent obtained during illegal extension of traffic stop); *United States v. Washington*, 490 F3d 765, 777 (9th Cir 2007) (where consent obtained immediately after illegal seizure, without any "appreciable intervening circumstances," evidence must be suppressed); *United States v. Lopez-Arias*, 344 F3d 623, 630 (6th Cir 2003) (suppressing evidence obtained during consent search when consent obtained during illegal arrest); *United States v. Vasquez*, 638 F2d 507, 527-29 (2d Cir 1980), *cert den*, 450 US 970 (1981) (consequence of "an illegal entry is to make unlawful any ensuing interrogations or searches," and "suppression is required * * * unless the taint of the initial entry has been dissipated before the 'consents' to search were given"); *Commonwealth v. Swanson*, 56 Mass App Ct 459, 463-64, 778 NE2d 958 (2002) ("evidence [obtained after the illegal entry] must be disregarded in assessing the lawfulness of the search"); *In re Ashley W.*, 284 Neb 424, 444, 821 NW2d 706 (2012) (ordering suppression of evidence derived from consent search made during unlawful stop).

P3d ___ (2014). In fact, the majority specifically disavows them when it disputes the dissents' suggestion that "we have modified the *Hall* analysis to remove the presumption that a consent search following unlawful police conduct is 'tainted,'" 356 Or at 84, and insists that the burden of establishing the admissibility of evidence produced as a result of such a consent search remains with the state. 356 Or at 88. But if the presumption held and the burden stayed put, the majority could not decide this case the way that it does.

It is when the majority applies the principles that it articulates that the majority reveals the extent to which it "refines" prior law. In describing the officers' unconstitutional conduct in this case, the majority writes that "nothing about the limited nature of the unlawful conduct, or the purpose or flagrancy of the conduct, suggests that it caused defendant to consent to the search." 356 Or at 92. If the majority had presumed that the officers' illegality and defendant's consent to search were causally connected, the majority—like courts throughout the nation and like the Oregon courts that decided the cases cited above—would have been required to move to the next step in the analysis and consider whether the state had proved intervening or mitigating facts that would permit the admission of the evidence. And, had the majority moved to that step, it would have been compelled to concede that the state had not proved such facts.

In its application of the principles that it articulates, the majority neither presumes a causal connection between the police illegality and defendant's consent to search nor rests its decision on the state's proof of intervening or mitigating facts. Rather, the majority dispenses with the presumption by declaring that "mere but-for causation is insufficient to justify suppression of the evidence, even in the absence of intervening or mitigating circumstances." 356 Or at 92. In so declaring, the majority not only disregards the advantage that an officer commands when engaged in a continuing constitutional violation, the majority also ignores this court's holding in *Ayles* that there is nothing "mere" about the motivating effect of such an advantage:

"[A] defendant establishes a more substantial connection than merely one thing occurring after another when that

defendant establishes that he or she consented to a search *during* an unlawful detention. In such a circumstance, the fact that the defendant is not legally free to leave because of the illegal police activity cannot be discounted in motivating the defendant's consent, and therefore, such illegal police conduct normally will be at least minimally connected to the defendant's decision to consent."

348 Or at 635.

Moreover, by ignoring the causal connection that exists when officers use unconstitutional means to seek and obtain consent to search, the majority effectively shifts the burden of proof to the defendant. Instead of requiring the state to prove that the evidence that the officers obtained did not derive from their unconstitutional acts by proving intervening or mitigating circumstances, the majority requires the defendant to prove facts in addition to the police illegality to demonstrate the necessary causal connection. Thus, the majority relies on the fact that defendant "does not argue that anything about the nature of the trespass or his interactions with the detectives significantly affected his consent." 356 Or at 92. If the burden remained with the state, then the majority would have identified the evidence that the state had adduced to demonstrate that defendant's consent to search was *unrelated* to the fact that uniformed officers had come onto his property, into his backyard and up to his sliding glass bedroom door, woken him from sleep, and, pressing that unconstitutional advantage, requested his consent to search.

Why the unacknowledged change in the presumption and the burden? The majority does not dispute that, when an individual is "subject to police authority in excess of constitutional bounds," the individual is "placed at a disadvantage relative to the constitutional position that he or she would have occupied in the absence of the illegal police interference." 356 Or at 73. The majority concedes that "every police illegality puts an individual in a worse position than if no illegality had occurred." 356 Or at 82. And, the majority recognizes that the purpose of the exclusionary rule is to restore defendants to the same position that they would have occupied if "the government's officers had stayed

within the law." *Hall*, 339 Or at 24; *State v. Davis*, 295 Or 227, 234, 666 P2d 802 (1983).

As the reason for the changes that it implements, the majority states that "the exploitation test announced in *Hall* does not account sufficiently for the importance of a defendant's voluntary consent to search." 356 Or at 77. The reason, the majority explains, is that "[o]ur cases demonstrate that, in some situations, a defendant's voluntary consent itself may be sufficient to demonstrate that the unlawful conduct did not affect or had only a tenuous connection to the evidence produced." 356 Or at 77-78. True enough, but the cited cases—*State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993), and *State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981)[2]—are the same cases that the state relied on in *Hall* and that the court found unconvincing. The court explained in *Hall* that, in *Rodriguez* and *Kennedy*, the officers did not engage in illegal conduct and then, pressing their advantage, politely ask for consent to search. There were intervening, mitigating facts: In those cases, before the police sought consent to search, the defendants had "volunteered to allow the search without any police prompting," and, in *Kennedy*, the police also provided the defendant with *Miranda* warnings. *Hall*, 339 Or at 34. Thus, under *Hall*, *Rodriguez*, and *Kennedy*, the state was required to prove intervening or mitigating facts, other than tainted consent, to establish the admissibility of the evidence that the officers discovered.

The majority acknowledges as much when it states that "*Hall* could be read as effectively having *created* a *per se* rule that evidence gained from a requested consent search always must be suppressed if that request occurs in close temporal proximity to the illegal stop and no intervening or mitigating circumstances exist." 356 Or at 78 (emphasis added). The majority is correct in that understanding of *Hall*. The majority is wrong when, later in its opinion, it cites *Hall* for the proposition that "mere but-for causation is insufficient to justify suppression of the evidence[.]" 356 Or

---

[2] The majority also cites *State v. Williamson*, 307 Or 621, 772 P2d 404 (1989), in which police officers had traded on evidence that they had only by virtue of their illegality. The evidence was not admitted: "[T]he officers *** were trading on evidence that they had only by virtue of the unlawful roadblock. That is a far cry from *Kennedy*." *Id*. at 626.

at 92. Both interpretations of *Hall* cannot be correct, and only the former justifies the result that the court reached in *Hall* and applied thereafter.

The majority is correct that, in *Hall*, the court stated that

> "this court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained 'but for' unlawful police conduct."

339 Or at 25. However, the majority fails to point out that the court then went on to explain what it meant by that statement: that, although a defendant establishes a causal connection sufficient to result in suppression when the defendant establishes a but-for relationship between an unconstitutional act and the evidence to be suppressed, the state may prove to the contrary:

> "[A]fter a defendant establishes the existence of a minimal factual nexus—that is, at minimum, *the existence of a 'but for' relationship*—between the evidence sought to be suppressed and prior unlawful police conduct, the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9, *see, e.g.*, *Johnson*, 335 Or at 522-26 (discussing principle); (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; *see, e.g.*, *Smith*, 327 Or at 379-80 (discussing principle); or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence, *see, e.g.*, *State v. Jones*, 248 Or 428, 433-34, 435 P2d 317 (1967) (discussing principle)."

*Id*. (emphasis added). It is the third means by which the state may fulfill its burden to demonstrate that the evidence did not derive from the preceding illegality on which the

majority hangs its hat—that the violation "has such a tenu-
ous factual link to the disputed evidence that that unlawful
police conduct cannot be viewed properly as the source of
that evidence." *Id*. But, again, the majority makes more of
that hook than it can hold.

In *Hall*, the court cited *State v. Jones*, 248 Or 428,
435 P2d 317 (1967), as discussing the principle on which
the majority relies. In *Jones*, the court had observed that a
causal link between an unconstitutional act and resulting
evidence may be too tenuous to require suppression when
intervening events or circumstances—such as a legal arrest
or the passage of time—break the causal chain. *Id.* at 434.
In *Hall*, the court reasoned that, when such a break occurs,
the admission of the challenged evidence

> "does not offend Article I, section 9, because the defendant
> has not been disadvantaged as a result of the unlawful
> police conduct, or, stated differently, because the defendant
> is not placed in a worse position than if the governmental
> officers had acted within the bounds of the law."

339 Or at 25.

*Hall* and this court's decisions since *Hall* make
clear that, when the police engage in unconstitutional con-
duct that gives them an advantage and thereby obtain con-
sent to search, the resulting evidence must be suppressed
to restore the defendant to the position the defendant would
have occupied had the police acted within the bounds of the
law. As is evident from those cases, the defendant's consent
results from the unconstitutional act—it is a continuation
of that act and not a break in the causal chain. The court
explained why that is so in *Ayles*:

> "A defendant gains nothing from having a constitutional
> right not to be seized if the police can seize him and—by
> definition—use the circumstance of that seizure as a guar-
> antee of an opportunity to ask him to further surrender his
> liberty."

348 Or at 631. Thus, in *Ayles*, *Rodgers/Kirkeby*, and *Hall*,
once the defendants established that officers had used the
advantage afforded by their unconstitutional acts to obtain
consent to search, the evidence that the officers obtained as
a result was suppressed.

In reaching a contrary result in this case, the majority does far more than merely "refine" the *Hall* analysis and add factors for a court's consideration: It changes its focus completely. The majority notes, unremarkably, that, if an officer's conduct is "intrusive, extended, or severe, it is more likely to influence improperly a defendant's consent to search." 356 Or at 81. The majority then reasons from the dissent in *Ayles* that, "where the nature and severity of the violation is limited, so too may be the extent to which the defendant's consent is 'tainted'" and that "the degree of attenuation necessary to purge the taint is correspondingly reduced." 356 Or at 81 (citing *Ayles*, 348 Or at 654 (Kistler, J., dissenting)). The majority also engrafts federal considerations of "purpose" and "flagrancy" into the Oregon constitutional analysis. The majority reasons that particularly flagrant conduct is "more likely to affect the defendant's decision to consent than more restrained behavior[,]" 356 Or at 82, and that purposeful police conduct may be "relevant both to understanding the nature of the misconduct and, ultimately, to deciding whether the police exploited that misconduct to obtain consent to search." 356 Or at 83.

Certainly *more* intrusive, extended, severe, flagrant, or purposeful unconstitutional conduct may have a *greater* effect on a defendant's decision to consent, but that does not mean that other unconstitutional conduct has none. What the majority refuses to confront openly is that, until today, the state was required to prove *some* intervening or mitigating circumstance *other than* a tainted consent to obtain admission of illegally obtained evidence.

To reach its conclusion that a court need not suppress the evidence that officers gain when they engage in unconstitutional conduct and simultaneously seek and obtain consent to search, the majority must overrule one of two holdings: (1) the holdings in *Hall*, *Rodgers/Kirkeby*, and *Ayles* that an ongoing constitutional violation significantly affects and is causally related to a defendant's simultaneous consent to search; or (2) the holdings in those cases that, when such a causal connection exists, the constitutional violation—whatever its nature or severity—requires suppression. If it overrules the former, then the majority

disregards the advantage that officers obtain when they seek consent during the course of a constitutional violation. If it overrules the latter, then the majority determines by the attachment of adjectives which constitutional violations will be vindicated and which will not.

The fact that the majority explicitly overrules neither is itself troubling. In *Farmers Ins. Co. of Oregon v. Mowry*, 350 Or 686, 261 P3d 1 (2011), the court decided not to overrule a prior decision because

> "[w]e assume that fully considered prior cases were correctly decided, and defendant raises no argument that was not rejected by the majority in [the prior decision]. As such, there is no principled reason for this court to overrule [that decision] on the ground that the majority was wrong. * * * [J]udicial fashion or personal policy preference are not sufficient grounds to reverse well established precedent."

*Mowry*, 350 Or at 700 (citations omitted). Similarly here, the state raises no argument that was not rejected by the majority in *Hall*, *Rodgers/Kirkeby*, and *Ayles*. I see no principled reason for this court to overrule those cases or to decide, without explicitly overruling them, that the new rule that it articulates is an improvement on the old. And I do not see the new rule as an improvement. The rule that a continuing unconstitutional act creates an advantage that requires suppression absent proof of intervening or mitigating facts was clear and workable, and the majority does not mount a case to the contrary.

It may seem "reasonable," in a constitutional sense, to permit officers to enter the backyard of a home, knock at a bedroom door, and seek consent to enter when the officers suspect drug activity and are concerned about the welfare of children inside the home. Courts with that view have reasoned that the officers do not violate the constitution when, pursuing a lawful objective, they walk to the back door of a residence after receiving no response at the front. *See, e.g.*, *United States v. Perea-Rey*, 680 F3d 1179, 1187-88 (9th Cir 2012) ("[I]t remains permissible for officers to approach a home to contact the inhabitants. The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual

contact with the occupants of the home. Officers conducting a knock and talk also need not approach only a specific door if there are multiple doors accessible to the public."); *United States v. Raines*, 243 F3d 419, 421 (8th Cir 2001) ("[L]aw enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence."). Under those courts' precedents, therefore, the actions in which the officers engaged in this case would not violate the constitution, and thus evidence obtained by those actions would be admissible.

But that is not what the majority decides here. The majority accepts the state's concession that the officers acted unreasonably and violated defendant's Article I, section 9, rights when they moved beyond his front door and entered his property. The majority then holds that it will impose no consequence for that violation. The majority refuses to restore defendant to the position that he would have occupied if "the government's officers had stayed within the law." *Davis*, 295 Or at 234. What that means is that officers may violate the constitution without consequence in this and other circumstances in the future and, consequently, that the state may benefit from the officers' constitutional violations. The only apparent restriction imposed by the majority is that a court may decide, after the fact, that the conduct of the officers was so severe, purposeful, or flagrant that, in the court's opinion, suppression must follow. But how can the police or the public know before the fact which adjective a court will attach? And, more importantly, by what measure will this court determine the "degree" of the constitutional violation?

If an officer's acts are "reasonable," then, perhaps, they do not violate the constitution. But if the officer's acts do violate the constitution, they cannot be deemed "reasonable" in any sense of that word.[3] Courts, understandably, wish to

---

[3] With respect, the concurrence mistakes the focus of the inquiry. Citing the dissent in *Hall*, Justice Landau asks: "If a defendant has, in fact, voluntarily consented to the search, why should the courts not vindicate that decision?" 356 Or at 95 (Landau, J., concurring). He expresses doubt about whether police misconduct may "deprive[] subsequent consent of its force[,]" *id.* at 95, and joins the majority "which gives greater attention to the role of a defendant's consent to a warrantless search." *Id.* at 103.

hold criminals accountable for their crimes. But the majority's new rule removes a solid brick from the constitutional wall that prohibits the state from benefitting from its illegality. *See Davis*, 295 Or at 233-34 ("The object of denying the government the fruits of its transgression against the person whose rights it has invaded is not to preserve the self-regard of judges but to preserve that person's rights to the same extent as if the government's officers had stayed within the law.").[4]

---

The issue that we confront is not whether a defendant's consent obviates the need for a warrant, is valid, or has "force." If officers obtain voluntary consent to search, the consent is valid and effective in the sense that the officers do not violate the constitution when they search pursuant to the consent and without a warrant. In that sense, the ensuing search is reasonable and constitutional. But that does not answer the question of the consequence that flows from the *preceding* unconstitutional and admittedly unreasonable act—in this case, the illegal entry.

We know from the majority opinion in this case, adhering to prior cases, that, when officers illegally stop a car, see contraband that they would not have seen had they acted within constitutional bounds, and seek and obtain the defendant's voluntary consent to search, the officers exploit their illegal seizure and the evidence must be suppressed. 356 Or at 86. That is so, even though the consent was valid and of force in the sense that the officers did not violate the constitution when they searched pursuant to the consent and without a warrant. The evidence is suppressed not because the officers searched without valid consent; rather, it is suppressed because the officers stopped and seized the defendant illegally. That illegal seizure gave the officers an advantage—the vantage that allowed them to see the contraband—and they used that advantage to seek consent to search. Suppression is required to restore the defendant to the position that the defendant would have held had the officers acted constitutionally.

My point is that it is not the validity of a defendant's consent that is an issue in an exploitation analysis. Instead, the issue is the consequence that a court will impose when officers obtain, by unconstitutional acts, an advantage that they would not have held had they remained within the law.

[4] I do not see Justice Landau as arguing that that brick should remain in place and be supported by a second brick of deterrence. Justice Landau considers "the idea" of tainted consent to be "something of a fiction." 356 Or at 95 (Landau, J., concurring). The reason, I think, is that he is not convinced that, when officers engage in unconstitutional acts, those acts have an "actual" effect on a defendant's decision to respond affirmatively when the officers ask for consent to search. But it is not only the concern that an unconstitutional act may serve as a motivating force that underlies this court's "personal rights" jurisprudence. Until today, this court has recognized that, when officers engage in unconstitutional acts, those acts place them at an advantage and enable them to seek consent that they otherwise could not obtain. Consequently, the evidence that the officers obtain must be suppressed unless the state can show that the officers inevitably or independently would have obtained or did obtain the same evidence or that intervening or mitigating circumstances demonstrate that the illegality was not the source of the evidence. That "personal rights" rule is simply a rule that the state may not retain the benefit of its illegal conduct and that the defendant must be returned to the *status quo ante*. Justice Landau does not expressly reject that

This case illustrates the significance of the change that the majority has engineered. In this case, as the state concedes, the court must adhere to a century of jurisprudence and acknowledge that the officers violated defendant's Article I, section 9, rights when they entered his backyard. But under the majority's rule, the court need not engage in the analysis necessary to overrule that precedent; rather, it may describe the violation as "limited" and thereby permit it.

This court has an obligation to demonstrate to the people of Oregon that our constitution is enduring: That it is made of sterner stuff than four votes represent; that it can withstand the forces of the day that call, always call, for understanding and flexibility to permit the government to act. Surely government must act; but when it violates the constitution in doing so, it should not benefit.

I respectfully dissent.

Baldwin, J., joins in this opinion.

**BREWER, J.,** dissenting.

Article I, section 9, of the Oregon Constitution protects the personal right to be secure against unlawful searches and seizures. *State v. Davis*, 313 Or 246, 253-54, 834 P2d 1008 (1992); *State v. Kosta*, 304 Or 549, 553, 748 P2d 72 (1987); *State v. Tanner*, 304 Or 312, 315-16 n 2, 745 P2d 757 (1987). When the government violates that right by conducting an unreasonable search or seizure in obtaining evidence, the right is protected "through the sanction of [the] suppression of evidence." *Davis*, 313 Or at 253. Suppression

---

view. However, because Justice Landau votes with the majority, I do not think that he endorses it.

If what Justice Landau suggests by arguing for deterrence as a rationale for the exclusionary rule is that there are some continuing constitutional violations that require suppression and some that do not, based on whether deterrence is warranted, I disagree. How we draw such lines, other than purely subjectively, is a mystery to me. For instance, as I point out in note 3, when officers violate the constitution, see evidence, and then seek consent to search, we suppress the evidence that they obtain in their search, but when the officers violate the constitution and do not see evidence until after they obtain consent to search, we do not. I do not see how adding a deterrence rationale will allow us to better articulate a constitutional basis for that distinction or better "vindicate a defendant's right to be free from unreasonable search and seizure"—our goal as the majority states it. 356 Or at 73.

is justified by the rationale that it is necessary to place the person subjected to the violation in the same position as if no violation had occurred. *Id.* at 254.

Questions frequently have arisen concerning the causal connection between a person's consent to search and a preceding violation of his or her right to be free from an unlawful search or seizure. The argument that, where consent is voluntary, there is no constitutional right to be restored to the person has persistently been made. *See, e.g.,* *State v. Rodgers*, 347 Or 610, 642-43, 227 P3d 695 (2010) (Durham, J, dissenting). Although the majority does not subscribe to that argument, to properly resolve cases like this one, it is nevertheless important to understand why that argument is mistaken. When a person consents to a warrantless search of his or her person or property and the person's capacity for self-determination has not been overborne or critically impaired, the consent is voluntary. *State v. Stevens*, 311 Or 119, 133-38, 806 P2d 92 (1991). However, that does not necessarily mean that the person has knowingly relinquished his or her right under Article I, section 9, to be free from unreasonable searches and seizures. That is because consent to search can be voluntary but not amount to a knowing waiver of the person's constitutional rights. In particular, the person may not know that the conduct that placed the officer in a position to seek consent was unlawful or that the person has a right under Article I, section 9, to refuse consent. That is, even though the person's free will has not been overborne or critically impaired in the sense required to make the consent to search involuntary, he or she still may be missing vital information that the officer has not disclosed which, if known, would have affected the decision to give consent. For that reason, there remains a constitutional right to safeguard under Article I, section 9, where unlawful police conduct preceded the giving of voluntary consent to a search. *State v. Hall*, 339 Or 7, 34-35, 115 P3d 908 (2005).

As the majority notes, the state has the burden to prove by a preponderance of the evidence that a warrantless search is valid. *State v. Tucker*, 330 Or 85, 90–91, 997 P2d 182 (2000); ORS 133.693(4). To satisfy that burden where unlawful police conduct preceded the giving of voluntary

consent to search, the state must prove that evidence that the police obtained as a result of the search did not derive from the unlawful conduct. *Hall*, 339 Or at 24. To do so, the state must show that (1) the police inevitably would have discovered the evidence through lawful procedures in the absence of the illegality; (2) the state obtained the evidence independently of the violation of the defendant's rights; or (3) the factual link between the violation and the evidence is so "tenuous" that the violation cannot be viewed as the source of the evidence. *Id.* at 25. Where, as here, the state relies on the third path, that is, attenuation, the state must show that the unlawful conduct did not "significantly affect" the defendant's decision to give consent, even if the consent itself was voluntary. *Id.* at 32, 35.

The considerations that this court identified in *Hall* are "relevant to" the determination whether unlawful police conduct significantly affected the giving of consent. *Id.* Those considerations are (1) the "temporal proximity" between the unlawful police conduct and the defendant's consent; (2) the existence of any intervening circumstances; and (3) the presence of any other circumstances, such as *Miranda* warnings or other admonitions, that would have informed the defendant of his or her right to refuse consent and would have mitigated the effect of the illegal police conduct. *Hall*, 339 Or at 35.[5] The primary question in this case is whether other factors, including the purpose and flagrancy of police misconduct leading to the giving of consent, should be balanced against the considerations identified in *Hall*.

Because the factors of purpose and flagrancy that the majority introduces derive from Fourth Amendment jurisprudence, it is useful to consider the historical similarities

---

[5] The court in *Hall* stated that "determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case." 339 Or at 35. Interestingly, each of the considerations that the court identified is an objective indicator of the strength of a causal connection between police misconduct and consent or the evidentiary fruits of an ensuing search. That is, none of those considerations necessarily indicates whether police misconduct actually affected the giving of consent in a particular case. Because the state has the burden of proving that a warrantless search is valid, and the defendant cannot be compelled to testify, it is perhaps unsurprising that objective considerations would bear primary emphasis in determining what might otherwise appear, in the terms that the court framed it, to be a subjective inquiry.

and differences between federal and Oregon attenuation analyses involving consent searches. As this court noted in *Hall*,

> "In *Brown v. Illinois*, 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975), the United States Supreme Court also identified some of these considerations as relevant to deciding the admissibility of a defendant's voluntary statements following a Fourth Amendment violation. *See id.* at 603-04 (in deciding whether Fourth Amendment exclusionary rule requires suppression of defendant's voluntary statements following unlawful arrest, court should consider whether police provided defendant with *Miranda* warnings, along with '[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct'). *** [T]he *Brown* factor of 'purpose and flagrancy of the official misconduct' relates to only the deterrence rationale of the Fourth Amendment exclusionary rule and has no applicability to the exclusionary rule under Article I, section 9. The other considerations that the Supreme Court identified in *Brown*—namely, whether the police had provided the defendant with *Miranda* warnings (or, in the case of a consent search, with a warning that the defendant had the right to refuse consent), the temporal proximity between the illegality and the defendant's confession or consent, and the presence of intervening circumstances—relate to the causal connection between the preceding illegality and the defendant's confession or consent, and, for that reason, also are relevant to the decision whether exclusion is required to vindicate a defendant's rights under Article I, section 9."

*Hall*, 339 Or at 35 n 21. In short, the attenuation analyses for consent searches under the federal and state constitutions generally employ similar factors, but the federal analysis includes additional factors—purpose and flagrancy of police misconduct—that the court in *Hall* rejected based on differences in the underlying natures of the two constitutional provisions: The Fourth Amendment aims at deterring police misconduct, whereas, Article I, section 9, focuses on the protection of personal rights.[6] Although the majority in this case

---

[6] Whether there are constitutionally grounded reasons for that "either-or" distinction is a different matter. Because the most effective way to uphold a constitutional right is to eliminate the incentive to knowingly violate it, I fail to

notes those differences in constitutional focus, it disagrees with the fundamental premise of *Hall* that the factors of purpose and flagrancy are immaterial to a rights-based analysis under Article I, section 9. As explained below, I do not share that view.

To characterize unlawful police conduct as "purposeful" means that the misconduct was investigatory in design and purpose and executed "in the hope that something might turn up." *Brown*, 422 US at 605; *United States v. Simpson*, 439 F3d 490, 496 (8th Cir 2006). Because the relevant inquiry under Article I, section 9, is whether a person's consent was significantly affected by preceding police misconduct, the purpose of the misconduct is immaterial to the analysis unless that purpose was apparent to the suspect. However, even where a suspect knows the purpose of police conduct, determining the effect of such knowledge on the decision to give consent does not necessarily get at the problem. The facts of this case illustrate the point. Here, defendant knew from the outset of his encounter with the officers that the purpose of their presence was investigatory, and he may well have inferred from their request for consent to enter his residence that they were hoping to find contraband. However, there is no evidence that defendant knew that the officers' presence at his bedroom door was unlawful. As discussed below, knowing that fact when the officers requested consent might well have made a difference in defendant's decision.

---

understand why a deterrence-based rationale for suppression should not supplement the rights-based focus of Article I, section 9. This court came close to—but fell short of—saying as much in *State v. McMurphy*, 291 Or 782, 785, 635 P2d 372 (1981):

> "[T]he deterrent effect on future practices against others, though a desired consequence, is not the constitutional basis for respecting the rights of a defendant against whom the state proposes to use evidence already seized. In demanding a trial without such evidence, the defendant invokes rights personal to himself."

The court's reticence was understandable, in that it probably foresaw the unfortunate consequences of an analysis that either supplants a rights-based focus with a deterrence rationale or uses lower deterrence value as a counterweight to the protection of personal rights where the court perceives a constitutional violation to be "minor." For that reason, I would insist on describing deterrence as a supplemental—not alternative or collateral—rationale for suppression where consent to search is not fully informed.

A related problem exists with respect to applying the factor of flagrancy. Misconduct is "flagrant" when its "impropriety * * * was obvious or the officer knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless." *Green*, 439 F3d at 496 (citing *Brown*, 422 US at 605): That is, flagrancy refers to the *officer's* knowledge, or likely awareness, of the illegality of his or her conduct. Of course, conduct that is obviously unlawful in the eyes of a trained and experienced police officer may be carried out in such a way that an uninformed suspect would not know that it is unlawful. In that circumstance, the flagrancy of the misconduct would not affect the suspect's giving of consent, and it therefore would not be relevant to the analysis under Article I, section 9.

On the other hand, police conduct whose unlawfulness is obvious to a suspect can affect the giving of consent, even when it does not literally overcome the free will of the suspect. The question is how such manifest flagrancy should be weighed or balanced, if at all, in the attenuation analysis. Under the majority's conception, it would appear that politely executed police misconduct—although obviously illegal—may not unlawfully taint consent even when it is given in close temporal proximity to the misconduct, no intervening circumstances operate to break the causal connection between the two, and the suspect is not advised of his or her right to refuse consent.

In my view, it is in this vexing cranny of Oregon's search and seizure jurisprudence that there is a special—albeit supplemental—space for deterrence, even though the primary focus of Article I, section 9, is to protect personal rights. If unlawful police conduct is flagrant in a way that is pertinent to the attenuation analysis in consent cases—that is, its unlawfulness is obvious to the officer and suspect alike—then it has no business occurring, even if delivered in an inoffensive wrapper. Flagrant misconduct, however committed, should weigh heavily in favor of suppression both to protect personal rights and so that officers are not tempted to think that they can engage in unlawful evidence-generating acts with impunity as long as they do so courteously.

But, where police misconduct is not flagrant in the constitutional sense, that is, where the officer does not know or likely know that he or she has engaged in unlawful conduct, and if there is no reason for the suspect to know that the conduct is unlawful either, there still remains a risk that the unlawful conduct will significantly affect the giving of consent when the latter follows the former in brief sequence and the suspect is not advised that he or she is free to refuse consent. In other words, the fact that police conduct was not obviously unlawful does not necessarily make it less likely that the misconduct affected the giving of consent. Thus, subject to the caveat discussed below, there is little room in a rights-focused conception of Article I, section 9, for a lack of flagrancy in unlawful police conduct to weigh in favor of attenuation in the context of a consent search where other factors point in the direction of suppression.

That said, as this court stated in *Hall*, the issue is what "effect" unlawful police conduct had on a suspect's decision to give consent to search. *Hall*, 339 Or at 32. For that reason, it is tempting to agree—at least in principle—with the logic of the following statement by Justice Kistler in his dissenting opinion in *State. v. Ayles*, 348 Or 622, 654, 237 P3d 805 (2010):

> "The degree of attenuation necessary to purge the taint varies with the extent of the taint, and where * * * any taint is minimal, the required degree of attenuation is correspondingly reduced. The point has nothing to do with deterrence. Rather, under a rights-based suppression analysis, the degree of attenuation necessary to purge the taint (and thus restore the defendant to the position he or she would have been in had no constitutional violation occurred) varies with the extent, nature, and severity of any illegality. Any other rationale would give a constitutional violation that had only minimal effect far greater reach than either the constitution requires or good sense warrants."

I cannot rule out the possibility that nonflagrant but unlawful police conduct that is relatively brief in duration and "minor" in its nature and degree of severity might not significantly affect a suspect's decision to give consent yet still qualify as an unreasonable search or seizure for constitutional purposes. Such a bare constitutional violation

arguably could be a mere "but for" cause of obtaining disputed evidence, and thus not require suppression.[7] *See Hall*, 339 Or at 25 ("[T]his court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained 'but for' unlawful police conduct."). It is difficult, however, to conceive of obvious examples of a "minor" constitutional violation that likely would have had only a minimal effect on consent without resorting to fine distinctions such as "unreasonable but just barely so." It is unsurprising that this court in *Hall* did not undertake or endorse such a hairsplitting analysis. Judging degrees of relative severity in determining the effect of a constitutional violation on a defendant's consent does not readily lend itself to principled and predictable decision making, and it is therefore best avoided except in the most obvious case. This, in my view, is not such a case.

As noted, the state had the burden of showing by a preponderance of the evidence that the warrantless entry into and ensuing search of defendant's residence was valid. *Tucker*, 330 Or at 90-91. Thus, the state was required to prove that the police trespass in this case did not significantly affect defendant's consent for the police to enter and search his residence. *Hall*, 339 Or at 34-35. The evidence showed that the police officers here had knocked for a significant period of time at doors of defendant's residence where they lawfully could be present. After receiving no response for "two to three minutes," they then unlawfully entered the back yard of the residence and, knocking at a sliding glass door to defendant's bedroom, roused him out of bed. Without advising defendant that he did not have to allow them further entry, one of the officers told defendant that the police had received complaints of drug activity at his residence and asked defendant if he could enter. Defendant asked to put on a robe and then allowed the four officers to enter.

---

[7] "In order that conduct be the actual cause of a particular result it is almost always sufficient that the result would not have happened in the absence of the conduct; or, putting it another way, that 'but for' the antecedent conduct the result would not have occurred." W. La Fave & A. Scott, *Handbook on Criminal Law* 249 (1972).

Defendant led the officers from his bedroom, where his girlfriend was still in bed, into his kitchen. An officer repeated that they were investigating complaints about drug activity and asked defendant it he would show them around the house. Although the officers were polite and the tone of the encounter was conversational, few people subjected to it would regard such an intrusive, focused, and determined police presence at their backyard bedroom door as a minor or insignificant factor in deciding whether to give consent to search their residence. Unsurprisingly, defendant did give consent. Only after locating incriminating evidence inside the residence did an officer read defendant a prepared "consent to search" card. At that point, defendant exercised his right to counsel, refused to sign the card, and, again, predictably—but too late—asked the officers to leave.

Here, the unlawful trespass violated defendant's right to be secure against unreasonable searches of his personal residence, because it closely preceded the initial giving of consent, no cognizable intervening circumstance broke the causal connection between the officers' unlawful presence at defendant's bedroom door and the giving of consent (or the ensuing discovery of the challenged evidence), and the advice of rights came too late to make a practical difference in defendant's initial decision to give consent. To punctuate matters, once defendant understood his rights, he belatedly asked the officers to leave. Finally, and moreover, even if the flagrancy of the police misconduct in this case were relevant to the attenuation analysis, there was no evidence that the officers mistakenly but reasonably believed that they had acted lawfully in entering defendant's backyard and knocking on his bedroom door, much less that any such belief affected defendant's decision whether to give consent to the ensuing entry into and search of his residence.

Accordingly, I would conclude that the state failed to meet its burden to show by a preponderance of the evidence that the police trespass did not significantly affect defendant's consent to the entry into and search of his residence. Suppression was required in those circumstances, even though defendant voluntarily consented to the entry and initial search of his residence. In my view, to so conclude does not undervalue the effect of defendant's consent;

rather, it accords that consent the reduced weight to which it is properly entitled in the attenuation analysis, where the police engaged in unlawful conduct in an effort to obtain the consent and there is no indication that, in giving it, the defendant was aware either of the unlawfulness of the police conduct or of his right to refuse. I therefore respectfully dissent.

**BALDWIN, J.,** dissenting.

In this case, several officers deliberately violated defendant's privacy rights protected by Article I, section 9, of the Oregon Constitution. After two of the officers entered defendant's backyard, they approached a sliding glass door connected to defendant's bedroom. Detective Roberts knocked on the glass door, looked through it. and observed defendant. Awakened by the intrusion, defendant opened the door. Roberts asked to enter the residence to look around, and defendant allowed him and the other officers to do so. The officers then discovered illegal drugs in defendant's residence. Today, by declining to suppress the evidence obtained as a result of that deliberate violation of defendant's privacy rights, the majority departs from longstanding precedents of this court protecting the privacy rights of citizens in their homes from warrantless governmental intrusions.

Without a search warrant, the officers went to defendant's residence early on a Sunday morning to investigate suspected drug activity. To be sure, the officers' conduct in knocking on the front doors of the residence accessible to the public was appropriate and necessary based on the information that they had received. However, rather than staying within the constitutional bounds of a proper investigation, the officers chose to pursue an illegal course of action. Freelancing, the officers entered defendant's backyard and approached a private entrance to defendant's bedroom. Detective Scharmota testified that, when defendant came to the door, "[h]e had just gotten out of bed. He complained of some back pain, he was pretty sore." The trial court found that defendant "awoke to the knock on the slider door in the back and the [detectives] allowed him to put a robe on" and that "it was obvious that the girlfriend was still in the bed" when the detectives entered defendant's bedroom.

On review of the trial court's denial of defendant's motion to suppress, the Court of Appeals rejected the state's argument "that the officers' trespass did not taint the defendant's consent." *State v. Unger*, 252 Or App 478, 487, 287 P3d 196 (2012). Betraying incredulity, the unanimous panel opined that, "if the state's argument were correct, officers could break into an individual's home, sit inside and wait for the defendant to return home, and then ask the defendant for consent to search the home." *Id*. at 487-88. The court concluded,

> "In sum, the officers violated defendant's constitutional rights by trespassing on his property, and that violation tainted his subsequent consent to the officers' entry into and search of his house. As a result, all evidence obtained as a result of the entry and search should have been suppressed."

*Id*. at 488.

According to the rule now adopted by the majority, police officers may deliberately violate the privacy rights of citizens in their homes when, as here, they knock on a private back door, startle an occupant, ask to search the occupant's home, and then exploit the fiction of a consensual search if evidence of a crime is found in the home. If no evidence of a crime is found, the occupants will simply be required to endure the unreasonable governmental intrusion without a legal remedy. Article I, section 9, now provides no protection against such a warrantless search if the officers are well-mannered and courteous as they violate the constitutional rights of the occupants.

The Court of Appeals properly followed *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), to determine the appropriate resolution of this case. Under *Hall*, where, as here, a defendant's consent is tainted by illegal police conduct,

> "the state must prove that the defendant's consent was independent of, or only tenuously related to, the illegal police conduct. As * * * explained in *Hall*,
>
>> "'consent is insufficient to establish the admissibility of evidence from a warrantless search if the state cannot prove that the consent was independent of, or

only tenuously related to, any preceding violation of the defendant's rights under Article I, section 9. Unless the state is able to make that showing, then the defendant's consent cannot operate to validate a warrantless search because the defendant's consent *itself* derived from a violation of the defendant's rights under that state constitutional provision. To not require suppression in such circumstances would be inconsistent with the previously described rationale underlying the Oregon exclusionary rule, that is, to place a defendant in the same position as if the governmental officers had acted within the bounds of the law.'"

*Unger*, 252 Or App at 485 (emphasis in original).

Here, the state could not demonstrate that defendant's consent was independent of or only tenuously related to the officers' unreasonable intrusion:

"The trespass gave the officers the opportunity to obtain defendant's consent. In addition, the trespass was ongoing when the officers obtained defendant's consent to enter his house; the officers were standing, illegally, at the back of defendant's house when they obtained his consent to enter. That is, they were violating his rights when they asked if he would waive them. Indeed, he was facing a trespass by the very persons he would call to report a trespass."

*Id.* at 486.

Remarkably, under circumstances that include a startled and shaky consent to search a private residence, the majority decides to diminish the constitutional protection of Article I, section 9, because "the exploitation test announced in *Hall* does not account sufficiently for the importance of a defendant's voluntary consent." *State v. Unger*, 356 Or 59, ___ P3d ___. In my view, the majority has not adequately explained why the constitutional protection of Article I, section 9, should be relaxed when police officers unreasonably intrude into a private area of a home for the purpose of obtaining a consent to search the home.

The majority's analysis appears to be based on a premise that the illegal conduct of the police had dissipated by the time that the officers made a specific request to search defendant's home. It had not. As recognized by the Court of

Appeals, the officers continued to violate defendant's right to privacy "when the officers obtained defendant's consent to enter his house * * * they were violating his rights when they asked if he would waive them." *Unger*, 252 Or App at 486. Although the majority appears to still require that the state prove that the defendant's consent was sufficient to attenuate the taint of the illegal police conduct, the state has not demonstrated such attenuation in this case. The state is unable to do so, in part, because the illegality was ongoing at the time that the officers made the request to search defendant's home.

The majority cites no evidence produced by the state—no facts—tending to prove that the ongoing illegal police conduct was only a minor or remote cause of defendant's consent. *See, e.g.*, *State v. Rodriguez*, 317 Or 27, 41, 854 P2d 399 (1993) (where officer "did not trade on or otherwise take advantage of the [unlawful] arrest to obtain defendant's consent to the search," evidence did not require suppression). The majority then concludes that the officers' intrusion into a private area of defendant's home did not substantially affect the consent that he gave moments after the officers awoke him in his bedroom with his girlfriend. To state that conclusion is to refute it. Defendant, abruptly awakened and visibly experiencing back pain, was undressed at the time that the officers knocked at his bedroom door; he asked to be allowed to put on a robe. To be blunt, the "consent" obtained in this case is a fiction. Moreover, on these facts, to conclude that the state has met its burden of demonstrating that the illegal conduct of the officers did not substantially affect defendant's "consent" is likewise a fiction.

Thus, while the majority purports to retain the requirement that the state has the burden of proving that the taint from illegal police conduct has been attenuated, that requirement is dispensed with in this case. Even though the state has failed to meet its burden of proving attenuation, the majority now holds that the "purpose and flagrancy" of the illegal police conduct is "relevant to whether a defendant's consent resulted from exploitation of police misconduct." *Unger*, 356 Or at 81 (citing *Brown v. Illinois*, 433 US 590, 603-04, 95 S Ct 2254, 45 L Ed 3d 416 (1975)). Now, if

the illegal conduct by the police does not offend the majority's sensibilities under the ambiguous standard of purpose and flagrancy, the privacy rights of a citizen may be violated without consequence. In effect, the majority has shifted the burden to citizens to prove that the purpose or flagrancy of the illegal conduct in some way merits enforcement of their constitutional right to privacy. If a citizen does not meet that burden, the constitutional rights of the citizen do not merit enforcement. That represents a sharp departure from the "principled view of the effect of an unlawful seizure of evidence" adhered to by this court for decades. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983).

I also take exception to the majority's reliance on *dictum* in *United States v. Perea-Ray*, 680 F3d 1179 (9th Cir 2012), as permitting the type of governmental intrusion that occurred here under the Fourth Amendment. In *Perea-Ray*, Border Patrol agents violated the defendant's Fourth Amendment rights when they entered his carport and searched the area without a warrant. The court suppressed evidence of a crime because an agent "intrude[d] into an area of the curtilage [the carport] where uninvited visitors would not be expected to appear *** [t]herefore, by trespassing on the curtilage and detaining Perea-Ray, [the agent] violated Perea-Ray's Fourth Amendment rights." *Id*. at 1188-89. Notably, in distinguishing other proffered authority, the Ninth Circuit emphasized that the police encounter with the defendant in a private area of his property "was neither consensual nor in a public area of motel or apartment building." *Id*. at 1189 n 5.

Further, I dissent because the majority opinion, in addition to effectively overruling *Hall*, also seriously undermines the stability of other Article I, section 9, cases decided by this court.

Contrary to prior case law, the majority appears to view the conduct of the officers here as no more than a simple trespass. A neighbor or stranger may trespass. But this court has held that the warrantless intrusion by a police officer into the protected area of a home is a constitutional violation of the privacy rights of a citizen by the government. In my view, the rule fashioned by the majority today permits

a deliberate governmental intrusion into the privacy interests of citizens in their homes. *See State v. Tanner*, 304 Or 312, 321 n 7, 745 P2d 757 (1987) ("Rights under section 9 are defined not by privacy one expects but the privacy one has a right to expect *from the government*.") (emphasis in original). By viewing the police intrusion here as a simple trespass, the majority has forgotten the protection that this court has historically afforded citizens against unreasonable governmental intrusions into their privacy interests. *See State v. Campbell*, 306 Or 157, 170, 759 P2d 1040 (1988) ("[B]oth laws and social conventions have long recognized the right to exclude others from certain places deemed to be private. If the government were able to enter such places without constitutional restraint, 'the people's' freedom from scrutiny would be substantially impaired."). *See also Tanner*, 304 Or at 321 ("Residence in a house is uniformly deemed to be a sufficient basis for concluding that the violation of the privacy of the house violated the residents' privacy interests ***."); *State v. Dixson/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988) ("Allowing the police to intrude into private land, regardless of the steps taken by its occupants to keep it private, would be a significant limitation on the occupant's freedom from governmental scrutiny. Article I, section 9, does not permit such freewheeling official conduct.").

The majority errs by not recognizing the importance of the privacy interests at stake in this case. More than 50 years ago, Justice Kenneth O'Connell emphasized the critical importance of this court recognizing the full constitutional dimensions of its search and seizure decisions under Article I, section 9:

"The fundamental fallacy in the position taken by the majority is in viewing the law of search and seizure as if it had no constitutional content. The majority puts the problem in terms of weighing the interest of efficient law enforcement against the interest of the citizen to be free from an inordinate invasion of his privacy. The problem is treated as if it involved nothing more than a tort principle comparable to that which extends a privilege of entry upon private property to a fireman or policeman in carrying out a governmental function. In search and seizure cases the interest which is our principal concern is the citizen's

interest in being free from surveillance by executive officers of the government. The interest may be evaluated in terms of the danger which prompted the adoption of the Fourth Amendment. The amendment was adopted not simply to protect the citizenry from the inconvenience and embarrassment attending the entry of officers into their homes, but to put a check on executive action which might endanger political freedom. The amendment was drafted by those who had a fresh recollection of the abuses which had been exercised in the course of subjugating citizens to the will of despotic leaders. The danger of such abuses is still present. As Mr. Justice Frankfurter said in his dissent in *United States v. Rabinowitz*, 339 US at 82, 70 S Ct at 442, 91 L Ed at 669:

> "'The progress is too easy from police action unscrutinized by judicial authorization to the police state.'
>
> "*****
>
> "Article I, § 9, Oregon Constitution, and the Fourth Amendment should be construed in light of these dangers, 'so as to prevent stealthy encroachment upon or "gradual depreciation" of the rights secured by them, by imperceptible practice of courts or by well-intentioned but mistakenly overzealous executive officers.' *Gouled v. United States*, 255 US 298, 304, 41 S Ct 261, 263, 65 L Ed 647, 650 (1921)."

*State v. Chinn*, 231 Or 259, 295-96, 373 P2d 392 (1962) (O'Connell, J., dissenting) (footnote omitted).

Here, the majority has undervalued defendant's privacy interest in a private entrance to his bedroom. The sliding glass door was not a public entrance to the residence. The door was accessible only from a private backyard deck, and the deck was not accessible to the public. Under Article I, section 9, defendant has a right to be protected from a governmental intrusion into this private area of his home. *See Dixon/Digby*, 307 Or at 211-12; *Campbell*, 306 Or at 170; *Tanner*, 304 Or at 320-21. *See also United States v. Struckman*, 603 F3d 731, 746 (9th Cir 2010) (defendant's back yard was curtilage subject to Fourth Amendment protections); *Quintana v. Com.*, 276 SW3d 753, 760 (Ky 2008) ("A back yard is not normally an area that the general public would perceive as public access. While the back yard may

not always enjoy the protection of the curtilage, it is a rare one that does not."); *State v. Lewis*, 675 NW2d 516, 523 (Iowa 2004) (area of back yard and porch "intimately associated with domestic life and the privacies of [defendant's] home" considered protected curtilage).

Further, by failing to enforce the exclusionary rule in this case, the majority undermines this court's Article I, section 9, jurisprudence. The origins of this court's commitment to a rule excluding from criminal prosecutions evidence obtained as a result of an illegal search or seizure is nearly a century old. *See State v. Laundy*, 103 Or 443, 493-94, 204 P 958 (1922) (expressing approval of rationale for exclusionary rule adopted in *Weeks v. United States*, 232 US 383, 34 S Ct 341, 58 L Ed 652 (1914)). For decades, Oregon courts have protected the privacy rights of its citizens by faithful adherence to the seminal case of *Davis*, 295 Or 227.

In *Davis*, this court suppressed evidence obtained during a warrantless entry and search of the defendant's motel room and the search of his person after arrest. The search and seizure was not supported by probable cause, and reasonable suspicion alone was held insufficient to legalize police entry into the defendant's motel room. The court in *Davis* undertook to "review the basis upon which unlawfully seized evidence has been held inadmissible in this state." *Id.* at 231. After an exhaustive review of Oregon cases and United States Supreme Court cases, the court rejected a deterrence rationale for an exclusionary rule in favor of an approach that vindicates the personal rights of the person whose rights have been violated. In rejecting a deterrence rationale for the exclusion of evidence, the court quoted from the then recent case of *State v. McMurphy*, 291 Or 782, 785, 635 P2d 372 (1981):

> "[T]he deterrent effect on future practices against others, though a desired consequence, is not the constitutional basis for respecting the rights of a defendant against whom the state proposes to use evidence already seized. In demanding a trial without such evidence, the defendant invokes rights personal to himself."

*Id.* at 235.

The court in *Davis* further explained the rationale for a vindication of rights approach to the exclusionary rule:

"Thus this court has looked, rather, to the character of the rule violated in the course of securing the evidence when deciding whether the rule implied a right not to be prosecuted upon evidence so secured. From the beginning this consequence has been most obvious to courts when officers purporting to execute a judicial warrant seized evidence not covered by warrant *** or when the warrant was wrongfully obtained ***. But the principle is the same in warrantless seizures, because an officer can seize nothing without a warrant that could not properly be seized with a warrant if a magistrate had been at the officer's elbow."

"* * * * *

"In summary, although not without some diversity of expression, the court since *State v. Laundy*, *supra*, has held to a principled view of the effect of an unlawful seizure of evidence. It has maintained the principle that those rules of law designed to protect citizens against unauthorized or illegal searches or seizures of their persons, property, or private effects are to be given effect by denying the state the use of evidence secured in violation of those rules against the persons whose rights were violated, or, in effect, by restoring the parties to their position as if the state's officers had remained within the limits of their authority."

*Davis*, 295 Or at 235, 237 (internal citations omitted).

Notably, this court in *Davis* rejected the state's invitation "to stretch" exceptions to the warrant requirement to justify the police officers' actions in unlawfully entering defendant's motel room. *Id.* at 243. In declining that invitation, the court emphasized the vital function of the judicial branch in protecting the privacy interests of citizens in their homes:

"The very purpose of our constitutional provision was to protect a person's home from governmental intrusions. *State v. Chinn*, *supra*. This right against intrusion should be stringently protected by the courts. *See e.g.*, *Warden v. Hayden*, 387 US 294, 304, 87 S Ct 1642, 1648, 18 L Ed 2d 782 (1967), construing the similar provision of the federal constitution. As such, any exceptions to the warrant requirement should be narrowly and carefully drawn. *See*

> *Jones v. United States*, 357 US 493, 499, 78 S Ct 1253, 1257, 2 L Ed 2d 1514 (1958)."

*Davis*, 295 Or at 243.

In a later *Davis* case, this court announced an unambiguous exclusionary rule with respect to evidence illegally obtained from outside the state:

> "This focus on individual protection under the exclusionary rule, a rule that operates to vindicate a constitutional right in the courts, supports the constitutional rule that we announce here: If the government seeks to rely on evidence in an Oregon criminal prosecution, that evidence must have been obtained in a manner that comports with the protections given to the individual by Article I, section 9, of the Oregon Constitution. It does not matter *where* that evidence was obtained (in-state or out-of-state), or *what* governmental entity (local, state, federal, or out-of-state) obtained it; the constitutionally significant fact is that the Oregon government seeks to use the evidence in an Oregon criminal prosecution. Where that is true, the Oregon constitutional protections apply."

*State v. Davis*, 313 Or 246, 254, 834 P2d 1008 (1992) (emphases in original).

The court anchored the exclusionary rule in Article I, section 9, cases in that provision's guarantee that citizens be held secure against unreasonable searches and seizures. Thus, this court has recognized that privacy rights are not effectively secured unless the exclusionary rule precludes the government from obtaining a criminal conviction based on evidence that results from a violation of a defendant's Article I, section 9, rights:

> "Article I, section 9, of the Oregon Constitution, provides:
>
> "'No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure ***.'
>
> "*** The right guaranteed by Article I, section 9, is the right to be 'secure *** against unreasonable search, or seizure.' *If that constitutional right to be 'secure' against impermissible government conduct is to be effective, it must mean that the government cannot obtain a criminal conviction through the use of evidence obtained in violation of a*

> *defendant's rights under that provision. State v. Davis*, 295
> Or 227, 666 P2d 802 (1983); *see also State v. Isom*, 306 Or
> 587, 595, 761 P2d 524 (1988) ('[T]he state may not prove,
> over objection, any crime with unconstitutionally obtained
> evidence.')."

*Davis*, 313 Or at 253 (emphasis added). Here, contrary to
*Davis*, the government has been allowed to obtain a criminal conviction based on evidence that is a product of a violation of defendant's Article I, section 9, rights.

As previously noted, this court has repeatedly affirmed that the protection of a person's home from unreasonable governmental intrusions is at the core of the privacy interests guaranteed by Article I, section 9. Just last year, we said that the privacy interests of citizens in their homes were "inviolate":

> "An ultimate objective of the constitutional protections,
> both state and federal, against unreasonable searches
> and seizures is 'to protect the individual in the sanctity
> of his [or her] home[.]' *State v. Duffy et al.*, 135 Or 290,
> 297, 295 P 953 (1931); *see generally State v. McDaniel*, 115
> Or 187, 204-05, 231 P 965 (1925) (discussing constitutional
> protections against unreasonable searches and seizures
> as rooted in common law protection for sanctity of home).
> The degree to which law enforcement conduct intrudes on
> a citizen's protected interest in privacy and liberty is significantly affected by where the conduct occurs, such as
> in the home, in an automobile, or on a public street. *See
> State v. Tourtillott*, 289 Or 845, 865, 618 P2d 423 (1980)
> (so observing under Fourth Amendment to United States
> Constitution). *A government intrusion into the home is at
> the extreme end of the spectrum: 'Nothing is as personal or
> private. Nothing is more inviolate.' Id.*"

*State v. Fair*, 353 Or 588, 600, 302 P3d 417 (2013) (emphasis
added). But today, by declining to suppress the evidence in
this case, the majority concludes that the privacy interests of
citizens in their homes are not secure and may be violated.

This court has observed that the "undeniable importance of stability in legal rules and decisions *** applies
with particular force in the arena of constitutional rights
and responsibilities, because the Oregon Constitution is the
fundamental document of this state and, as such, should

be stable and reliable." *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 53, 11 P3d 228 (2000). Although we have recognized that the court must remain willing to reconsider prior decisions based on principled arguments, the majority has not explained how it reaches any principled arguments advanced by the state in this case, when the state has not met its burden of proving that the officers did not exploit their illegal conduct to obtain defendant's consent. Thus, the majority is not justified in modifying the constitutional rule adopted in *Hall* and in undermining the stability of other Article I, section 9, decisions. *See also State v. Ciancanelli*, 339 Or 282, 290-91, 121 P3d 613 (2005) (applying *Stranahan* and declining to overturn 20-year-old constitutional precedent).

By not enforcing the exclusionary rule in this case, the majority has failed to secure defendant's right to privacy in his home as guaranteed by Article I, section 9, of the Oregon Constitution. Without justification, the majority's decision today diminishes the privacy rights of citizens previously protected by this court and sharply departs from "the principled view of the effect of an unlawful seizure of evidence" faithfully adhered to by this court for decades. *State v. Davis*, 295 Or at 237. In my view, this judicial failure may well have the general effect of permitting deliberate warrantless intrusions by the government into the privacy rights of other citizens in their homes. I therefore respectfully dissent.

Walters, J., joins in this opinion.